UNITED STATES of America

v.

Daneworth McNAB, Troy J. Allen.

Crim. No. 91-0118.

United States District Court,
District of Columbia.

Oct. 1, 1991.

Patricia M. Haynes, Asst. U.S. Atty., Washington, D.C., for U.S.

Howard Katzoff, Washington, D.C., for McNab.

Nathan Silver, Bethesda, Md., for Allen.

## MEMORANDUM ORDER

JOHN GARRETT PENN, District Judge.

On March 7, 1991, the Grand Jury returned an indictment charging the defendants with unlawful possession of a firearm with an obliterated or altered serial number, 18 U.S.C. § 922(k), unlawful possession of a firearm not registered in the National Firearms Registration and Transfer Record, 26 U.S.C. § 5861(d), and unlawful possession of a firearm not identified by serial number, 26 U.S.C. § 5861(i).[1] On

1. Actually, the language of Count 1 of the indictment charged the defendants with transporting one of the guns seized in interstate commerce.

July 16, 1991, the Grand Jury returned a superseding indictment purportedly correcting Count 1, however, the new indictment also contained an error. The Court began the motions hearing on July 18, 1991. On July 18, 1991, the Grand Jury returned a second superseding indictment that was filed in open court. The defendants were arraigned on the July 18th superseding indictment on July 19, 1991.

The case is now before the Court on the McNab's Motion To Suppress Statements and Motion To Suppress Evidence, and Allen's Motion To Suppress Statement and Motion to Suppress Evidence. A hearing was held on July 18 and 19, 1991. After giving careful consideration to the motions and the opposition thereto, together with the record in this case, the Court concludes that Allen's motion to suppress evidence should be granted and all other motions should be denied.

I

Briefly, the facts as found by the Court are as follows: On February 6, 1991, officers of the Metropolitan Police Department received a report of "suspicious" activity relating to two cars parked in the area of the 1400 block of Whittier Place, N.W., in the District of Columbia. The citizen making the call thought that the occupants of the cars were selling drugs. The radio run referred to a "red sports car" and a "blue" car. Officer Dixon and his rookie partner,

Officer Rosenburg, responded to the area and while proceeding east on Whittier Place observed a red two door Chevette with the defendants seated inside. The officers also observed an empty red Mazda sports car parked diagonally across the street from the Chevette. Apparently they did not observe the blue car. The officers approached from the rear and stopped approximately five feet behind the Chevette. Both officers stepped out and Dixon approached the Chevette on the driver's side while Rosenburg approached on the passenger side. Up to this time the officers had observed nothing outwardly suspicious; the defendants appeared to be having a conversation. Both men were seated on the front seat with Allen on the driver's side. As Dixon approached Allen's door he observed a shotgun shell in Allen's lap and he immediately drew his gun.[2] When Rosenburg saw Dixon draw his gun, she drew her gun. The defendants were asked to step from the automobile and both were required to place their hands on the roof while Dixon conducted a search of the inside of the car, which was a two door hatchback. Dixon testified that at this point he arrested Allen and orally advised him of his rights but that he did not arrest McNab since it was Allen who had the shotgun shell. Dixon explained that he arrested Allen on a charge of "unlicensed ammunition." The Court finds that neither Dixon nor Rosenburg placed either Allen or McNab under arrest at this time.[3] The

2. Allen testified that he observed the officers approaching from the rear when he looked in his rear view mirror and that at that time McNab was holding the shotgun shell. Allen states that he took the shotgun shell from McNab and placed it on the floor under his seat. He contends that the officer could not have seen the shell. After considering the testimony of Allen, Dixon and Rosenburg, the Court accepts the testimony of the police officers. While Allen may have thought that the Dixon could not have seen the shell, he testified that he took the shell from McNab because he saw the officers approaching and he attempted to hide the shell because he did not want to get into trouble. During this brief period the officer could have seen the shell. The testimony of Rosenburg supports that of Dixon. She testified that as the officers approached the rear of the automobile their guns were not drawn. When she saw Dixon suddenly draw his gun, she drew her gun.

3. Allen testified that he was never told at the scene that he was under arrest and that Dixon did not tell him he was under arrest. Rosenburg did not hear Dixon advise Allen that he was under arrest and she did not place him under arrest. Moreover, subsequent events reflect that when McNab pointed out the two other men who had been in the Mazda, Dixon left to chase them and never placed handcuffs on Allen or McNab. Finally, when backup officers arrived, they were not advised that either Allen or McNab had been placed under arrest. Indeed, one officer who arrived at the scene advised the defendants that they could sit in the Chevette because it was cold outside. At this time, neither Allen nor McNab had been placed in handcuffs. Handcuffs were placed on the defendants only after the shotgun and pistol were found in the hatchback area of the Chevette.

officers observed a closed "buck" knife on the floor behind the front seat. Neither Dixon nor Rosenburg removed the knife from the automobile.

At this time both defendants were attempting to explain why they were in Washington[4] and McNab was "praying and crying and rambling" in attempting to tell the officers that he was not involved in anything. McNab referred to two men who had been in the Mazda and shortly thereafter pointed to the men as they came around a corner. Dixon observed the two men and noted that one appeared to have a pistol in his belt. Dixon started after the men, who were now fleeing, then stopped remembering that his partner had only been on the street for two days and was inexperienced. He called for backup help and then began to search the automobile starting with the area near the front seat and behind the front seat. He obtained the key, opened the hatchback and removed a phonograph speaker. He was beginning to unroll a blanket when Officer Delise, who was chasing the two men from the Mazda, called for backup. By this time, Dixon and Rosenburg had been joined by other officers. Dixon left one officer in charge of the defendants and he and Rosenburg went to assist Delise.

When two other officers, one of whom was Officer Ingram, arrived on the scene, they observed the defendants seated in the Chevette without handcuffs and another officer seated in a police vehicle across the street from the defendants' car. At the hearing, Ingram expressed surprise that there was not greater security over the defendants although he did not understand the exact status of the defendants.[5] At some point, and before Ingram and his partner knew whether the defendants had been arrested, they had the defendants step out of the car and then they began to search the Chevette. It was during this search that they found the shotgun and

pistol rolled up in the blanket in the hatchback portion of the Chevette. They then told the defendants that they were going to jail, placed handcuffs on them and sometime later, transported them to the police station. At the police station the defendants were given P.D. 47 Rights Cards. McNab signed his card and indicated that he was willing to answer questions. Allen answered that he understood his rights but he refused to sign the card or answer any questions.

## II

*A. Standing of the defendants to pursue the motion to suppress evidence.*

 The government argues that the Court should not entertain the motions to suppress because neither Allen nor McNab have standing to complain about a Fourth Amendment violation. In making this argument, the government relies on the decision in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In *Rakas,* the Supreme Court held that passengers in an automobile, stopped during the investigation of an armed robbery, did not have standing to challenge the search of the automobile, in which the police found a shotgun and rifle because the passenger asserted no possessory interest in the automobile or the guns found therein. The Court heard the motions to suppress notwithstanding the government's argument but preserved the government's standing argument.

Allen testified that the automobile belongs to his brother and he so advised the officers at the time of the search. He further testified that on or before the morning of February 6, 1991, a friend of his brother advised Allen that he and two other persons were driving to Washington and that they needed another car. Apparently, the three men including McNab were driving to Washington in the Mazda sports car which has room only for two persons.

---

**4.** The defendants had driven to Washington from Baltimore that morning.

**5.** Allen testified that when Dixon and Rosenburg left, another female officer (Rosenburg is

also a female) stood guard by holding a gun on them. Officer Ingram did not refer to the second female officer in his testimony.

Allen agreed to drive to Washington after being offered $50.00 for making the trip.

The government does not dispute that the Chevette is owned by Allen's brother and the Court has no reason to believe that Allen was driving the car without the permission of his brother. Moreover, while Allen did not have his own driver's permit, he did have the automobile registration and his brother's driver's permit in the car.[6] Based upon these facts, which are undisputed, the Court concludes that Allen has standing to challenge the search of the automobile. The Court does not read *Rakas* as requiring that only the owner of the automobile may complain about a search.

▉ With respect to McNab, the Court must reach a different result. Allen testified that he only met McNab on the morning of February 6, 1991 and that he had no other connection with McNab. Moreover, there is no evidence that McNab has any interest in the Chevette or that he claims any interest in the two guns found in the hatchback portion of the Chevette. Under those facts, McNab is in no better position than the petitioners in *Rakas*. He was nothing more than a passenger in the Chevette and as such cannot be heard to complain of the alleged illegal search of the automobile. Allen did testify that he was to be paid $50.00 for taking a passenger, presumably McNab, to Washington but those additional facts will not support a finding of standing for McNab. Indeed, while McNab might attempt to argue that he was a paying guest of Allen's, that factor is not controlling. In *Rakas*, the Supreme Court stated:

> We think that *Jones* [*Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)] on its facts merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable intrusion into that place. In defining the scope of that interest, we adhere to the view expressed in *Jones* and echoed in later cases that arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not control.

439 U.S. at 142–43, 99 S.Ct. at 430 (citations omitted).

The Court concludes that McNab lacks standing to pursue the motion to suppress evidence.

*B. The purported search incident to Allen's arrest.*

▉ The government does not seek to justify the challenged search as a *Terry* type search. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Rather, it argues that this was a search incident to the arrest of Allen. It contends that Officer Dixon observed Allen with the shotgun shell, that he seized the shell and then instructed both defendants to step out of the automobile where he arrested Allen but not McNab. His explanation for not arresting McNab is that he did not see McNab holding the shell. He testified that he arrested Allen on a charge of "unlicensed ammunition." He states that once he arrested Allen he gave him his rights but he did not read from the standard P.D. 47 Rights Card.

Allen tells a different story. According to him, when Dixon removed the shell from the floor[7], he said something to the effect that "you can go to jail for this" and that when the officer saw the knife he again mentioned jail. But after having the defendants step from the car, the officer took no action to restrain Allen; rather, he began to search the car for the shotgun, according to Dixon and, for drugs according to Allen.

While Dixon may have been concerned about a shotgun, it seems likely that he was also interested in finding drugs in the car. The radio run contained a reference to men selling drugs from the car and when other officers searched the Mazda parked across the street, they pulled out

---

**6.** Allen was not charged with driving without a permit and the government has not offered evidence that he does not have a permit.

**7.** *See* n. 2, *supra.*

the glove compartment, and removed some of the panelling. *See* Defendant Allen Exhibits 5, 6, and 7. When Dixon observed the other two men running around the corner and initially started to give chase, neither Allen nor McNab was in handcuffs. Dixon then remembered his rookie partner, called for a backup to find the two other men and then returned to the Chevette to continue his search. He began to search the hatchback area of the car and was about to remove the blanket when he received a call for assistance from the officers chasing the two other men. He returned some of the items to the Chevette and he and Rosenburg went to assist the officers, leaving a another rookie officer in charge of the defendants. When Officer Ingram came upon the scene, he did not know whether the defendants had been arrested. He testified that he found the defendants seated in the Chevette with the motor running and yet another officer, identified as Officer Wilson, seated in his squad car across the street. It appears that Wilson observed that the defendants were cold and allowed them to reenter their automobile. Ingram, concerned for the safety of the officers, had both defendants step out of the automobile and place their hands on the car while he began a new search of the automobile. It was after he found the guns that he told then they would be locked up and placed handcuffs on both men. He did not advise them of their rights. The defendants were not read their rights or asked to sign the Rights Card until after they were taken to the police precinct.

The Court finds that Officer Dixon did *not* arrest Allen after he observed the shell, or after he saw the knife. In fact, the officers did not remove the knife from the Allen's automobile until after both defendants were handcuffed by Officer Ingram. Ingram did not place the handcuffs on them until he found the guns. Thus, it seems clear that the search of the automobile was not a search incident to arrest because Allen had not been arrested prior to the search. As was noted above, the government does not argue that the search for the gun was a *Terry* search.

For these reasons the Court concludes that the search was not a search incident to arrest and that the government cannot rely upon that theory to sustain the search and seizure of the weapons.

*C. Assuming that Allen had been arrested, was the search of the hatchback area of the automobile valid.*

■ The Court finds that Allen had not been placed under arrest and that accordingly, there could not have been a search incident to Allen's arrest. Assuming for the moment that Allen had been arrested, which is not the case, the search of the hatchback area of the automobile would have been invalid in any event.

The government argues that the search of the hatchback was valid in view of the holdings in *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) and *United States v. Russell,* 216 U.S.App. D.C. 165, 670 F.2d 323, *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2909, 73 L.Ed.2d 1317 (1982). In *Belton,* a state trooper arrested Belton and then searched the interior of the defendant's automobile and discovered cocaine in the defendant's leather jacket which was on the back seat. The Supreme Court held that:

> [W]hen a policemen has made a *lawful custodial arrest* of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.
>
> It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach.

453 U.S. at 460, 101 S.Ct. at 2864 (citations and footnotes omitted, emphasis this Court's). The Supreme Court added that: "Our holding encompasses only the interior of the passenger compartment of an automobile *and does not encompass the trunk.*" 453 U.S. at 461, n. 4, 101 S.Ct. at 2864, n. 4 (emphasis the Court's).

In *Russell,* our Court of Appeals had occasion to decide whether heroin seized from the hatchback portion of a 1979 Mustang was a part of the interior of the automobile; the Court of Appeals held that the search was valid citing to the decision in *Belton,* but observed that: "Our decision is focused narrowly and specifically on the precise question whether *Belton*'s rule and rationale encompass the *hatchback in this case.* No other question is framed or answered by the decision." 216 U.S.App.D.C. at 167, n. 9, 670 F.2d at 325, n. 9 (emphasis this Court's). The Court of Appeals went on to note the "still evolving area of law" and waiting for "further enlightenment from Higher Authority." *Id.*

This Court does not read either *Belton* or *Russell* as laying down a hard and fast rule; rather, each case must be judged on its particular facts. The key appears to be whether the object within the hatchback is reachable. Here, it seems clear that the guns simply where not within reach and that they might as well have been in a trunk. Moreover, Officer Dixon opened the hatchback and removed some items and never saw the guns. Officer Ingram also searched the hatchback and removed several items and did not see the guns. He only located the guns after he attempted to remove the blanket.

*D. The motions to suppress statements must be denied.*

 The defendants also move for the suppression of statements. The government represents that it will only seek to use one statement made by Allen and none made by McNab, thus McNab's motion is denied as moot.

With respect to Allen's statement, while Ingram was standing next to Allen near the Chevette, he looked at the "junk" inside and observed that the car was a junk or words to that effect to which Allen responded, "it's my brother's car." The government argues that the statement did not result from a question asked by the officer and that the statement was spontaneous. The Court agrees. Allen's motion to suppress the statement is denied.

## III

In sum, the Court concludes that McNab's motion to suppress evidence must be denied because McNab lacks standing. *See* Part A, *supra.* The Court holds that Allen has standing and that his motion to suppress the evidence removed from the car must be granted for the reasons set forth in Parts B and C, *supra.* Finally, the motions to suppress statements are denied.

It is hereby

ORDERED that McNab's motion to suppress evidence is denied, and it is further

ORDERED that McNab's motion to suppress statements is denied, and it is further

ORDERED that Allen's motion to suppress evidence is granted, and it is further

ORDERED that Allen's motion to suppress statements is denied.