**Chauncy TURNER, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 91-CM-1509.**

District of Columbia Court of Appeals.

Argued March 4, 1993.
Decided April 23, 1993.

Jay D. Schiffres, Washington, DC, appointed by the court, for appellant.

Renate D. Staley, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas C. Black, and Michael L. Volkov, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FERREN, SCHWELB and FARRELL, Associate Judges.

FARRELL, Associate Judge:

In *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Supreme Court held that, once the driver of a car has been validly detained as a criminal suspect under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),

the search of the passenger compartment of [the] automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Id.* 463 U.S. at 1049–50, 103 S.Ct. at 3481 (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880). In this case, following the stop of appellant's hatchback automobile and his removal from it, the police opened a rear quarter panel in the interior of the car and seized a loaded nine millimeter pistol from atop the "doughnut" spare tire. The trial judge sustained the search and seizure on the authority of *Terry* and *Long*. Appellant contends that the police lacked the required articulable suspicion to justify his stop and detention, and that, in any event, the search of the vehicle was unjustified because the gun was not hidden in a place "within [his] immediate grasp," *id.* 463 U.S. at 1051, 103 S.Ct. at 3482, or from which he could "gain immediate control" of it. *Id.* at 1049, 103 S.Ct. at 3481. We review *de novo* the question whether the police had articulable suspicion (part II.), *Brown v. United States*, 590 A.2d 1008, 1020 (D.C. 1991), as well as the permissible scope of a weapons search under *Long* (part III. A.), but we consider only whether a "substantial basis," *Brown, supra,* underlies the trial court's finding that the pistol was within appellant's reach (part III. B.). Although the case is a close one at each step of our analysis, we affirm.

## I.

We summarize the essential facts, which are described in detail in the trial judge's post-trial memorandum. On October 19, 1991, Metropolitan Police Department officers and FBI agents were collaborating on a task force concerned with repeat offenders. Of particular interest to them was one Carlos McGill, whose portable car telephone had been tapped by the FBI. Monitoring the tap, agents heard McGill discuss with another man the proposed transfer of a firearm to be used in killing someone. The agents shared this information with police officials. The agents had a description of McGill and understood that he would be driving a red 1989 Nissan 300 ZX automobile. The firearm transfer was expected to take place on October 19 in the parking lot of the Shrimp Boat restaurant near East Capitol Street and Benning Road, S.E., across the street from a Metro parking lot. MPD Officer Hubbard, serving at the time as a deputized FBI agent, knew from monitored conversations that McGill had a gun in the trunk of his car.

Hubbard was responsible for conveying to police units on the street information retrieved from the FBI wiretap, and he radioed over police channels a description of McGill's vehicle and McGill's name.

Officer Kelvin King of the MPD and his partner were on routine patrol in the Benning Road area and heard the radio lookout for a red 300 ZX Nissan belonging to "Carlos," a black male. The license plate number of the vehicle was also described. At some point King was flagged down by an FBI agent and an MPD officer, and began to assist in surveillance of the Shrimp Boat parking lot. A short time later a red two-door Nissan 300 ZX entered the adjacent Metro parking lot; King noticed that "the seats was [sic] reclined." The vehicle passed out of King's sight, but other officers soon informed him by radio that a black male had stepped out of the car and, in the company of a second man whose car apparently had been waiting in the lot, opened the rear of the Nissan and "[did] something in the trunk." The driver of the Nissan then re-entered the car and left the parking lot, driving south on Benning Road. King was instructed to follow the car, which he did for several blocks until he was ordered to stop the vehicle.

While pursuing the car, King noticed that its license plate differed from the description broadcast earlier, though he knew that "a lot of time if a crime was to go down, say like a stolen vehicle, ... license plates can easily be switched." When he stopped the car and ordered the driver—appellant—to step out, he discovered from appellant's driver's permit that he was not Carlos McGill. In the meantime, other officers or agents had reached the scene and quickly searched the interior of appellant's car, finding nothing. At about the same time, two foot patrol officers ran up to the car. One of these officers, Rodney Hawkins, had been told at roll call to watch for a red Nissan 300 ZX suspected of involvement in a planned "hit" or shooting in the Sixth District that day. Arriving at the scene, Hawkins learned that other officers had "searched around the seats and the back" of the hatchback vehicle, but he "decided to look in the back again" because he had previously owned a similar model and knew that the car "had a storage compartment in the right quarter panel where the spare tire is." [1] Asked where "that quarter panel [was] in relation to the driver's seat of a Nissan 300 ZX," Hawkins explained that "if you just lay your seat back, you can reach right over towards the back of the vehicle." He therefore opened the hatch using the key and "pulled [down] the quarter panel," located behind the speaker. Inside was a "doughnut" tire and on top of the tire was a loaded nine millimeter Smith and Wesson pistol. Hawkins yelled to the others that he had found a gun. Recalled to the stand as a witness, Officer King testified that he heard Hawkins say "A gun" before he himself had concluded, from examining appellant's license, that they "might have the wrong person" and announced that fact to the others.

■ At the suppression hearing, appellant argued that the failure of the license plate numbers to match and, even more, Officer King's discovery that appellant was not Carlos McGill eliminated any reason the police had for detaining him and suspecting that his car was linked to a firearm transfer and prospective shooting. The trial judge found, however, that King's "uncertainties" about whether appellant's car was McGill's vehicle "were still inchoate as the search was brought to a conclusion by Officer Hawkins," and that even if Hawkins had known of King's "developing suspicions" as he began his search,[2] he still

---

**1.** Hawkins explained that "if you never owned that particular vehicle, you would not know about that doughnut tire in the right rear quarter."

**2.** Ultimately the judge did not dispute—nor does the government disagree on appeal—that whatever knowledge King had acquired bearing on the reasonableness of the detention at the time

Hawkins found the gun was attributable to the entire police team, whether or not he communicated that information to the others. We agree with the government's concession; the "collective information" doctrine, *In re M.E.B.,* —— A.2d ——, —— No. 90–FS–1602, slip op. at 14 (D.C. Feb. 23, 1993), must apply equally to information augmenting or diminishing the objective basis the police have for conducting a seizure.

"would have been justified in completing his relatively limited search as the status quo was maintained while the doubts raised by Officer King were resolved at curbside." The judge reasoned:

> Even King recognized that license plates can be detached and substituted. Moreover, license plate numbers on a moving car can be misread or garbled in communication. Similarly, [driver's] permits can be misappropriated, altered, or misused. Apart, then, from discrepancies in license and permit, the search and seizure was explicable by correspondence between recent, reliably obtained police intelligence and the make, model, color, and itinerary of defendant's car, as well as defendant's being black, male, and driver of the car. Further, the timing of events[, in King's words], was in "clock work" conformity with what had been predicted. Under the exigent circumstances of preventing the transfer of a murder weapon from a travelling automobile, the police responded reasonably and acted rationally. (Footnote omitted.)

The judge further reasoned that, "except for the area that lay under the hood, defendant's [hatchback] car consisted exclusively of a passenger compartment," and hence the search of the interior panel was proper under the authority of *Michigan v. Long, supra.*

## II.

■ Appellant first argues that whatever reasonable basis the agents and police had for stopping his car and fearing that he had a weapon evaporated when Officer King learned that appellant was not Carlos McGill and that the car bore license plates different from those McGill's car reportedly carried. The trial judge concluded, to the contrary, that reason for the detention persisted long enough to "resolve[ ]" King's "doubts" about the involvement of appellant's car at curbside, during which time Hawkins discovered the pistol. We sustain that conclusion.

The Fourth Amendment requires "some minimal level of objective justification" for making [a] stop.... That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence.

*United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (citation omitted). *See Gomez v. United States,* 597 A.2d 884, 888 (D.C.1991) ("The requirement of 'articulable suspicion' is not an onerous one"). Here Officer King's calculations as to whether he still had reason to detain appellant were made almost simultaneously with the search by Hawkins leading to discovery of the gun.[3] Appellant displayed a driver's permit indicating he was not McGill, and his license plate did not match McGill's car. Yet, minutes before, King had seen appellant's Nissan 300 ZX arrive in a parking lot adjacent to the Shrimp Boat restaurant, where he and another person engaged in conduct consistent with the predicted transfer of a firearm. King, who was not privy to the underlying facts of the McGill investigation and had been impressed into surveillance duty while on routine patrol, wrestled with the conflicting facts that appellant's actions appeared in "clock work" synchronization with the forecast of events, *see Alabama v. White,* 496 U.S. 325, 332, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301 (1990),[4] yet he appeared not to be McGill. In this kind of quickly developing situation, we are instructed "not [to] indulge in unrealistic second-guessing" of the police officer's judgment. *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). Ultimately our task is to decide whether the conduct of the police was reasonable. *Soldal v. Cook County, Ill.,* — U.S. ——, ——, 113 S.Ct. 538, 549, 121 L.Ed.2d 450 (1992) ("reasonableness is still

---

**3.** Indeed, Officer Redding, who ran to the scene with Officer Hawkins, testified that they were only 75 yards away when appellant's car was stopped and that it took them "[f]ive seconds, six seconds, something like that" to reach the scene.

**4.** Although the anticipated weapon exchange had apparently already taken place, that did not eliminate the basis King had for suspecting appellant's dangerousness based on involvement in preparations for a "hit" or killing that day.

the ultimate standard under the Fourth Amendment") (citation and internal quotation marks omitted). Had the police released appellant immediately and been wrong (*i.e.*, had he actually been en route to, or otherwise in preparation of, a "hit" in that police district), their conduct would scarcely be seen as more reasonable than the "intermediate response," *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), of detaining him minutes longer to clarify his involvement. That in essence was Officer King's thinking. We conclude that he had not lost an objective basis for holding appellant long enough to resolve an ambiguous situation by the time Officer Hawkins discovered the gun moments later. That same uncertainty as to appellant's status justified an area search within the boundaries of *Michigan v. Long, supra,* to which we now turn.

### III.

### A.

■ Appellant contends that *Michigan v. Long* does not justify Hawkins' action in opening the rear quarter panel of the hatchback vehicle. He argues that the security concerns underlying a weapons search sanctioned by *Long* cannot realistically apply to a gun enclosed in a rear quarter panel of a car (albeit an interior one) requiring removal of a cover to gain access to it, particularly when the driver has been removed from the car and is under control of the police. Appellant further asserts that the government's proof failed because neither Hawkins nor anyone else testified that the gun had been "within [appellant's] immediate grasp," *Long,* 463 U.S. at 1051, 103 S.Ct. at 3482, when he

was situated in the car. We are not convinced by these arguments.

In *Long* the police had stopped the defendant's car after he was seen driving at an excessive speed and his car had swerved into a ditch. Long also appeared intoxicated as he left the car and walked toward the police car. When he began walking back toward the open door of his car, the police followed him and saw a large hunting knife on the floorboard of the driver's side of the vehicle. They stopped him and frisked him, finding nothing. They then saw a leather pouch protruding from under the armrest in the front seat and searched it, finding marijuana. "A further search of the interior ... including the glovebox" revealed no other contraband. *Id.* at 1036, 103 S.Ct. at 3474.[5] The Supreme Court concluded that the search of the vehicle "was restricted to those areas to which Long would generally have immediate control, and that could contain a weapon." *Id.* at 1050, 103 S.Ct. at 3481. It therefore upheld the search under principles derived chiefly from *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), but limited to the protective search justification articulated in *Terry v. Ohio.*

Specifically, the Court recited its holding in *Belton* that, in a search for both weapons and destructible evidence incident to the valid arrest of a car's occupant, police may search "inside the relatively narrow compass of the passenger compartment" of the car, and may "examine the contents of any open or closed container found within the passenger compartment...." *Id.* at 1049, 103 S.Ct. at 3479 (quoting *Belton,* 453 U.S. at 460, 101 S.Ct. at 2864).[6] In *Belton* the Court based this authority on the need to furnish police with a "workable definition of 'the area within the immediate con-

---

**5.** Following Long's arrest and impoundment of the car, the police found marijuana in the trunk of the car, but the Supreme Court left to the state appellate court on remand the separate issue of the propriety of this search. 463 U.S. at 1053, 103 S.Ct. at 3483.

**6.** *Belton* had defined "container" for this purpose as

denot[ing] any object capable of holding another object. It thus includes closed or open

glove compartments, consoles, or other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, clothing, and the like. Our holding encompasses only the interior of the passenger compartment of an automobile and does not encompass the trunk.

*Belton,* 453 U.S. at 460–61 n. 4, 101 S.Ct. at 2864 n. 4.

trol of the arrestee' when that area arguably includes the interior of an automobile and the arrestee is its recent occupant." *Belton*, 453 U.S. at 460, 101 S.Ct. at 2864 (quoted in *Long*, 463 U.S. at 1048–49, 103 S.Ct. at 3480). This "workable rule" was grounded in the reality that "articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within the area into which an arrestee might reach in order to grab a weapon or evidentiary ite[m]." *Id.* (citation and internal quotation marks omitted). In *Long*, while stressing that a *Terry* search (unlike a search under *Belton*) is justified solely by "the protection of the police officer and others nearby," *id.* 463 U.S. at 1049–50 n. 14, 103 S.Ct. at 3481 n. 14 (citation omitted),[7] the Court perceived no reason to define the *spacial scope* of a *Terry* search differently than in *Belton*. It therefore held that, so long as the police possess the requisite basis for a *Terry* stop and search, they may—as in *Belton*—"search ... the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden...." *Id.* at 1049, 103 S.Ct. at 3481. As in *Belton*, too, the Court rejected arguments that "it was not reasonable for the officers to fear that Long could injure them, because he was effectively under their control during the investigative stop and could not get access to any weapons that might have been located in the automobile." *Id.* at 1051, 103 S.Ct. at 3482; *see Belton*, 453 U.S. at 461 n. 5, 101 S.Ct. at 2865 n. 5.

Following *Belton*, it has been held that "a hatchback reachable without exiting the vehicle properly ranks as part of the interior or passenger compartment" of an automobile within *Belton's* definition. *United States v. Russell*, 216 U.S.App.D.C. 165, 167, 670 F.2d 323, 327, *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2909, 73 L.Ed.2d 1317 (1982); *United States v. Pino*, 855 F.2d

357, 364 (6th Cir.1988) (same; rear section of mid-sized station wagon). This court, too, applying *Belton*, has upheld the warrantless search of a *locked* glove compartment incident to the lawful arrest of the car's driver. *Smith v. United States*, 435 A.2d 1066 (D.C.1981), *cert. denied*, 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982); *see also Staten v. United States*, 562 A.2d 90 (D.C.1989). Subject to the critical limitation imposed by *Terry's* protective search rationale, there is no principled basis for treating a search of the interior compartment of a hatchback (or a locked glove box) differently depending on whether *Belton* or *Long* provides the justification for the search. *See, e.g., United States v. Holifield*, 956 F.2d 665, 669 (7th Cir.1992) (upholding search of locked glove compartment under *Long's* authorization of weapon search in "closed containers shaped such that they could contain a weapon located within the passenger compartment"); *United States v. Brown*, 913 F.2d 570, 572 (8th Cir.) (same), *cert. denied*, 498 U.S. 1016, 111 S.Ct. 590, 112 L.Ed.2d 594 (1990). Nor is there a principled reason for distinguishing a locked glove box, accessible only by first retrieving the key and inserting it, from an interior quarter panel reachable by leaning back and pulling down the unlocked cover. So long as both are compartments or receptacles from which the suspect, on returning to the vehicle, "may gain immediate control of weapons," *Long*, 463 U.S. at 1049, 103 S.Ct. at 3481, *Long* clearly implies that the search of either is permissible under *Terry* and the Fourth Amendment.

The *Long* decision has been criticized for expanding the scope of a *Terry* protective search on the basis of safety concerns that could be met by less intrusive police behavior. *See* W. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.4(c), at 532–35 (1987); *People v. Torres*, 74 N.Y.2d 224, 544 N.Y.S.2d 796, 543 N.E.2d 61, 63–65 (1989).[8] Thus it is tempt-

---

**7.** Though "[a]n additional interest" of preservation of evidence "exists in the arrest context," "[w]hat we borrow now from ... *Belton* is merely the recognition that part of the reason to allow area searches incident to an arrest is that the arrestee ... may be able to gain access to

weapons to injure officers or others nearby.... This recognition applies as well in the *Terry* context." 463 U.S. at 1049–50 n. 14, 103 S.Ct. at 3481 n. 14.

**8.** In *Long* the Court rejected an obligation on the part of the police to make "quick determina-

ing to construe narrowly a permissible search under *Long* as confined to the front seat area of the car (in *Long* only the search of the pouch beneath the front arm-rest yielded contraband from the car interior) or at least to compartments not requiring both reaching and removal of a covering to enter them, as in this case. But the essential purpose of *Belton*, carried over by *Long* to the *Terry* context, was to spare police officers the need to make on-the-spot distinctions of this sort among places in the passenger compartment that are "generally, even if not inevitably, within the area into which [a detainee] might reach in order to grab a weapon...." *Long*, 463 U.S. at 1049, 103 S.Ct. at 3480 (internal quotation marks omitted). A quarter panel reachable from the interior merely by lifting down an unlocked cover falls within *Belton*'s "workable definition" of this area, whereas "the interior of door panels" or space "under the floorboards" requiring some dismantling to reach, *Belton*, 453 U.S. at 470, 101 S.Ct. at 2869 (Brennan, J., dissenting), clearly would not. Any dissatisfaction one might privately feel with *Belton*, or its extension in *Long*, cannot justify artificial distinctions incompatible with the teaching of both.

### B.

▮ The issue thus boils down to whether there was evidence rationally permitting the trial judge to find that the gun in appellant's car was concealed where he could gain immediate control of it. When asked where the "quarter panel [was] in relation to the driver's seat of a Nissan 300 ZX," Officer Hawkins testified that "if you just lay your seat back, you can reach right over towards the back of the vehicle." The trial judge read this testimony to imply that the panel "was within reach of the

driver because you could lie back in the front seat and reach your hand over the side and get to the compartment." [9] We must view the evidence most favorably to the government and sustain that inference if at all reasonable. *See Peay v. United States*, 597 A.2d 1318, 1320 (D.C.1991) (en banc) ("In reviewing a trial court order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling"). The judge had previously received in evidence photographs showing a sidelong exterior view of appellant's car and the closed and open quarter panel viewed from the inside. These exhibits, together with the testimony, support an inference that the hatchback in this case was of the "coupe" variety permitting access to virtually anything within the interior of the car from the driver's seat.[10] On these facts, we cannot say that it was unreasonable for the judge to infer that an occupant of the car could gain immediate control of the gun by pulling down the panel cover, as Hawkins had. Under *Long*, the search of the quarter panel for a weapon was therefore proper under the Fourth Amendment.

*Affirmed.*

---

tions" about "what 'less intrusive' alternative exists to ensure that any threat presented by the suspect will be neutralized." 463 U.S. at 1052–53 n. 16, 103 S.Ct. at 3482 n. 16.

9. Appellant's seat was in a reclining position when he was stopped.

10. We thus adopt no general "hatchback" rule applicable to other cars nominally of the hatch-

back variety but which may contain a trunk enclosure inaccessible except by lifting the hatchback from the outside, *see United States v. McNab*, 775 F.Supp. 1, 6 (D.D.C.1991), or which have a large enough hatchback compartment that the area at issue, although visible to the occupants, is not "reachable without exiting the vehicle." *Russell*, 216 U.S.App.D.C. at 169, 670 F.2d at 327.