Easterly, Associate Judge, dissenting:
On the morning of his arrest, Mr. Ball was in the company of two female friends in what he thought was the privacy of his own home.[1] He was naked and the women were in some state of undress. The trio was loud. A downstairs neighbor called the police. The police responded and then entered his apartment, without permission *30 and without a warrant. In protest, Mr. Ball cried out, "This is my house. I live here. This is my house." He seemed to think the police had no authority to barge into his home. I would have thought such an entry was precisely what the Fourth Amendment prohibits. The majority opinion disagrees, interpreting the emergency aid exception to the Fourth Amendment's warrant requirement beyond the bounds of any precedent of the Supreme Court or this court. The majority opinion demands so little of the government to justify a warrantless entry into a home, it "reduce[s] the [Fourth] Amendment to a nullity and leave[s] the people's homes secure only in the discretion of police officers." Johnson v. United States , 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).
Although "[t]he Fourth Amendment protects the individual's privacy in a variety of settings[,] [i]n none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home-a zone that finds its roots in clear and specific constitutional terms." Payton v. New York , 445 U.S. 573, 589, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The Fourth Amendment states that "[t]he right of the people to be secure in their ... houses ... against unreasonable searches and seizures[ ] shall not be violated." Id. at 584-85, 100 S.Ct. 1371. As the Supreme Court has explained, "[t]hat language unequivocally establishes the proposition that at the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Id. at 589-90, 100 S.Ct. 1371 (internal quotation marks and brackets omitted); see also id. at 585, 100 S.Ct. 1371 ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.").
The sanctity of the home is protected by strict adherence to the warrant requirement. "Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society," but "[t]he right of officers to thrust themselves into a home is also a grave concern, not only to the individual, but to a society which chooses to dwell in reasonable security and freedom from surveillance." Johnson , 333 U.S. at 14, 68 S.Ct. 367. Thus, as a rule,
the Fourth Amendment has interposed a magistrate between the citizen and the police .... not ... to shield criminals nor to make the home a safe haven for illegal activities ... [but] so that an objective mind might weigh the need to invade the privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing, and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home.
Washington v. United States , 585 A.2d 167, 168 (D.C. 1991) (quoting McDonald v. United States , 335 U.S. 451, 455-56, 69 S.Ct. 191, 93 L.Ed. 153 (1948) ); see also Payton , 445 U.S. at 586, 602, 100 S.Ct. 1371 (explaining that the warrant requirement "interpose[s] the magistrate's determination of probable cause between the zealous officer and the citizen" and "minimizes the danger of needless intrusions."). Entering a home without first obtaining a warrant is "presumptively unreasonable." Brigham City v. Stuart , 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).
There are exceptions to the warrant requirement, but these are "few in number and carefully delineated."
*31 Welsh v. Wisconsin , 466 U.S. 740, 749, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). In particular, "[a]ny warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency." Kentucky v. King , 563 U.S. 452, 470, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) ; see also Brigham City , 547 U.S. at 403, 126 S.Ct. 1943 (the presumption that a warrant is needed to enter a home may be overcome only when " 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment."). The emergency aid exception is one subset of exigent circumstances: "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." Brigham City , 547 U.S. at 403, 126 S.Ct. 1943. But, clearly, the boundaries of this exception cannot be drawn so as to swallow the rule.
A critical means of cabining the exception is to hold the government to its burden of proof. Under our case law, the government must show that "the police [had] probable cause, based on specific, articulable facts, to believe that immediate entry [wa]s necessary to assist someone in danger of bodily harm inside the premises." United States v. Booth , 455 A.2d 1351, 1355-56 (D.C. 1983)[2] ; see also Bennett v. United States , 26 A.3d 745, 751 (D.C. 2011)
*32 (explaining that in the Fourth Amendment hierarchy, a "hunch or gut feeling" is at the bottom rung, followed by "reasonable articulable suspicion," which is still "substantially less than probable cause"). After all, if police were authorized to enter a home based on less than probable cause to believe that someone inside is in need of aid, the Fourth Amendment's asserted protection for the home would be no meaningful protection at all.
The majority opinion does not hold the government to its burden. To justify the warrantless entry into Mr. Ball's apartment, the majority relies on information that patently does not amount to probable cause (or an objectively reasonable basis, supra note 2) to believe that someone was in need of emergency aid. The sum total of the evidence the majority opinion can muster is testimony that one officer heard a woman's voice unintelligibly yelling "as if she was in pain or struggling"[3] ; that after the police knocked, identified themselves as police, and waited for a few minutes, a partially undressed woman answered the door; that according to one officer, the woman had a "somewhat panicked and concerned" look in her eye and quickly glanced into the apartment instead of answering when the officer asked if everything was okay[4] ; and that, while standing at the threshold, the police also saw another partially dressed woman standing in the living room.[5] Ante at 25-26; see also id. at 22-23.
Unquestionably, the information the police had before the door opened-unintelligible yelling "as if" an inhabitant of the apartment was struggling or in pain-did not give them probable cause to believe that someone was in need of emergency aid, and the majority opinion does not argue otherwise. Ante at 28-29 (relying on the yelling plus later-acquired "context"). People make noises in their homes, including yelling; sometimes they yell very loudly. If this is enough to justify a warrantless entry, then the Fourth Amendment's protections will turn on whether one has the luxury of owning a stand-alone home or whether one resides in an apartment or townhouse with shared walls. But see United States v. Ross , 456 U.S. 798, 822, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (acknowledging that under the Fourth Amendment "the most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion.").
*33 To be sure, the police were fully justified in knocking on Mr. Ball's door and conducting an inquiry based on the unintelligible yelling. But, between knocking on the door and crossing the threshold of the home, the police did not gain sufficient additional information to give them probable cause to believe that someone was in need of emergency aid. Rather, after the door opened, the police arguably moved further away from probable cause.[6]
Here, in response to police knocking, a woman came to the door.[7] Officer Kniseley's perception that she had a somewhat "panicked and concerned look" on her face was consistent with an individual being understandably surprised and concerned to be confronted by police at the door at 5 a.m. Her glance back into the apartment without immediately responding to the police was similarly ambiguous under the circumstances.[8] See Duhart v. United States , 589 A.2d 895, 899 (D.C. 1991) (explaining that "there are limits to the inference that an experienced reasonable police officer can rationally draw" and that if the information available to the police "is capable of too many innocent explanations, then the intrusion cannot be justified").
Even construing these facts as providing some corroboration that something was wrong in the apartment, the government did not have probable cause to believe they needed to enter Mr. Ball's apartment to provide emergency aid. We must also factor in what the police did not see. Ante at ---- (acknowledging that "the totality of the circumstances-the whole picture-must be taken into account"). The police saw nothing to confirm their suspicion that there was an assault in progress. Neither woman visible to the police from the threshold appeared to be "in pain or struggling," bleeding or bruised, crying or upset, or in any apparent physical danger. There was no sign of broken objects, upended furniture, or any evidence of a struggle or physical altercation.[9] In sum, *34 after the woman opened the door to the apartment, Officer Kniseley's guess that a woman had been yelling because she was being physically assaulted was still just a guess.
None of this court's prior cases support the majority opinion's broad conception of police authority to enter a home without a warrant based on mere speculation that someone may need emergency aid; instead they make clear that far more is required. The majority opinion resists the constraints of our precedent by attempting to show both that (1) the cases in which this court rejected warrantless entries based on the emergency aid exception, like Evans v. United States , 122 A.3d 876 (D.C. 2015) and Washington v. United States , 585 A.2d 167 (D.C. 1991), are distinguishable on their facts, and (2) cases in which we have upheld such warrantless entries, like Oliver , 656 A.2d 1159, actually demand very little information when applying the probable cause standard. These efforts are unpersuasive.
It is immaterial that the facts of Evans and Washington do not mirror the facts of this case. The salience of these decisions comes from this court's refusal to endorse surmise and speculation as a basis for warrantless entry under the emergency aid exception. In Evans , the police tried to search an apartment when the only two known occupants, "participants in an alleged domestic violence dispute," were already outside being interviewed by other officers. Ante at 26. But this court found a Fourth Amendment violation because "the police had no specific reason to believe that an unknown third party was in the apartment and in need of emergency aid." Evans , 122 A.3d at 882. The same is true is in this case. Upon seeing two women through the open apartment door, the police had no reason to believe that there was a third person inside who either might be in need of assistance or might place the two women in imminent danger. Supra note 9.
In Washington the police actually had more particularized information than they had in this case about the potential danger: they were responding to a report of a woman with a gun and the defendant's sister, having let them into the home, told them she wanted the gun "out of the house." 585 A.2d at 168. Nevertheless this court held that, once the police had seen that the sister was "in the living room by herself, out of harm's way," they no longer had "specific articulable facts" to believe that anyone was in immediate danger such that they were authorized to break down the door to the defendant's separately locked room and make a warrantless entry.[10] Id. at 172. The court held the police *35 should have "ceased their search immediately, or inquired into the nature of the weapon and the reason [the sister] called the police before proceeding." Id. Washington reaffirms both that the police may not rely on a speculative need to provide emergency aid to enter a home without a warrant and that when the police obtain information that contradicts or does not meaningfully buttress their speculation that someone is in need of emergency aid or imminent danger, they cannot simply plow forward, entering first and asking questions later. They must abide by the constraints of the Fourth Amendment and conduct any continuing investigation from the threshold.
Washington and Evans do not stand alone in our case law in affirming that the emergency aid exception to the warrant requirement is narrowly interpreted and reserved for situations where the police have probable cause to believe there is a true emergency. Indeed, the majority opinion has no choice but to concede that the argument that our prior cases have demanded "stronger grounds to believe that emergency aid was needed ... has some force." Ante at 27 (discussing Booth , 455 A.2d 1351, and Earle v. United States , 612 A.2d 1258 (D.C. 1992), and acknowledging "each of these cases has indicia of exigent circumstances not present in this case, such as the observation of blood on an occupant or the observation of physical injuries being inflicted inside the dwelling."). But the majority opinion looks to Oliver v. United States , 656 A.2d 1159, 1167 (D.C. 1995), to demonstrate that the requisite probable cause showing to believe someone is in need of emergency aid is not as demanding as this body of precedent indicates. Ante at 27-28 (citing Oliver for the proposition that this court has "upheld a warrantless entry under the emergency aid exception, without any evidence that the police observed blood or physical injuries before entering the dwelling."). Oliver , however, does not support the majority opinion's loose interpretation of the emergency aid exception to the warrant requirement: Oliver provides more authority to call this interpretation into question.
In Oliver , the police were investigating the kidnapping of an eighteen-day old infant from a hospital; over the course of a day of investigation, including two visits to the defendant's apartment, they developed information that gave them probable cause to believe that the "helpless and defenseless" newborn boy was there. 656 A.2d at 1167. In that context-where the police knew a crime had been committed, they had a suspect, and the only question was whether the victim, a newborn baby, could be said to be in need of emergency aid so as to justify the police's warrantless entry into the apartment to retrieve him-the court acknowledged that "it is true that this case is unlike the typical emergency exception where blood at the scene, gunshots, or cries for help will give police 'probable cause, based on specific, articulable facts, to believe that immediate entry is necessary to assist someone in danger of bodily harm.' " Id. The court then explained that the departure from this norm was justified by "the unique qualities of kidnapping" which "may create exigent or emergency circumstances, even without direct evidence of a threat of bodily harm to the victim." Id. (explaining that "kidnapping investigations present unusually compelling circumstances for emergency analysis" because "the life, freedom, and future of a human being is at stake" and that *36 kidnapped infants "in particular" are especially vulnerable). Far from dispensing with the requirement that the police need "direct evidence of a threat of bodily harm"-like "blood at the scene, gun shots or cries for help"-to justify a warrantless entry under the emergency aid exception, Oliver confirms that in cases that do not involve kidnapping, such "direct evidence" is required. Oliver demonstrates that the search in this case was unlawful.
Without precedent from this court, the majority opinion tries to find support for its expansive interpretation of the emergency aid exception in the Supreme Court's statement that the "role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." Ante at 25-26, 27-28 (quoting Michigan v. Fisher , 558 U.S. 45, 48, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) (quoting Brigham City , Utah v. Stuart , 547 U.S. 398, 406, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) ) ). But Michigan v. Fisher provides a dubious foundation for the majority opinion's holding, given that the police in that case actually observed "violent behavior." Specifically, the police saw (first through a window, then through an open door) that Mr. Fisher was "rag[ing]," "screaming and throwing things" inside his house and had already cut his hand, leaving blood on the hood of his truck. Id. at 45, 48, 130 S.Ct. 546. Based on these observations, the Supreme Court determined that "it was reasonable [for the police] to believe that [Mr.] Fisher had hurt himself ... and needed treatment that in his rage he was unable to provide," or that he "was about to hurt ... someone else." Id. at 49, 130 S.Ct. 546. Similarly, in Brigham City , the only other case in which the Supreme Court has upheld a warrantless entry under the emergency aid exception, the police observed a fight in the house through a kitchen window and saw one individual get punched in the face and then spit blood in the sink while others in the room attempted to restrain the assailant from continuing the attack. 547 U.S. at 401, 126 S.Ct. 1943. The majority opinion cannot credibly assert that the Supreme Court's conception of the emergency aid exception to the warrant requirement encompasses the warrantless, nonconsensual entry into Mr. Ball's apartment.
By affirming a warrantless home entry in this case based on nothing more than speculation and forward momentum, the majority opinion is redrawing the boundaries of Fourth Amendment protection for the home and diminishing its protection. The majority opinion denies this, asserting that its fact-specific analysis is "narrow." Ante note 7. But given that the facts it cites do not support-either on their own terms or under our case law-a determination that the police had probable cause to believe anyone in Mr. Ball's apartment was in need of emergency aid, I cannot agree. I see no limiting principle to the majority opinion's analysis. Rather, it effectively endorses the use of the emergency aid exception to justify warrantless investigative searches of homes.
The rationale for this retrenchment of Fourth Amendment protections for the home appears to be that the right to privacy must yield to the needs of law enforcement to prevent crime.[11] But the Supreme *37 Court has already rejected such overreaching reasoning in the investigative context:
The investigation of crime would always be simplified if warrants were unnecessary. But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law.
Mincey , 437 U.S. at 393, 98 S.Ct. 2408. This limit on police powers cannot be circumvented in the name of hypothetical crime prevention.
The majority opinion gives too little regard to the "precious" protection the Fourth Amendment affords the home against intrusion by government agents. Washington , 585 A.2d at 168. Courts bear the responsibility to set limits to ensure that the goals of law enforcement and peace keeping do not automatically override Fourth Amendment protections afforded to the home. Until now, this court has consistently held that more than speculation, if not actual evidence of injury or imminent danger, is required to support a determination that the police had probable cause to enter a home without a warrant to provide emergency aid. We should adhere to this precedent-not redraw the boundaries of this previously narrow exception to the warrant requirement so as to authorize an otherwise illegal entry. We should hold that the warrantless, nonconsensual search in this case was invalid. And we should uphold Mr. Ball's Fourth Amendment privacy rights in his home. I respectfully dissent.

These undisputed facts are from the trial testimony.

Booth also directs consideration of the subjective intent of the police officer. 455 A.2d at 1354. The majority opinion acknowledges that "probable cause" is the standard under Booth , but notes that "[t]he court has not decided whether the[ ] requirements [of Booth ] are still applicable in light of Brigham City ." Ante note 6.
Although the subjective intent of the officers has never been an issue in this case, the parties agree that the Supreme Court in Brigham City made clear that courts may not consider the subjective intent of the officer in assessing whether the police made a lawful, warrantless entry to provide emergency aid. As for whether the probable cause standard of Booth is still good law, the government argued for the first time in its brief on appeal that the Supreme Court in Brigham City displaced Booth and indicated a lesser quantum of proof-"an objectively reasonable basis"-was required to authorize a warrantless entry under the emergency aid exception. But when pressed at oral argument about the meaning of this language, the government acknowledged, given that the police in Brigham City had seen a bloody fight in progress through a window and had at least probable cause to believe someone was in need of emergency aid, it was unlikely that the Court had meant to announce a new rule that called our probable cause requirement under Booth into question. The government then pivoted and argued that the police had probable cause to enter Mr. Ball's home.
The majority opinion "assume[s] arguendo that the 'objectively reasonable basis' standard is equivalent to the 'probable cause' standard," ante note 6, but persists in using the former, fuzzy language. The majority asserts it is bound to use this terminology because the Supreme Court has "adopted" it, id. ; but, as explained above, it is unclear what the Supreme Court meant with the use of this language. Thus, in my view, we are bound to employ the standard as articulated by our court and consider whether the police had "probable cause," which we have specifically defined in this context. Booth , 455 A.2d at 1355 ; Oliver v. United States , 656 A.2d 1159, 1170 (D.C. 1995) (interpreting "probable cause" to require "reasonable grounds to believe based on specific articulable facts that immediate entry was necessary to assist someone in danger of bodily harm" quoting Booth ); see also id. at 1166 (explaining that under our "probable cause" standard, "solid facts ... not mere reasonable suspicion" is required).
Even if "an objectively reasonable basis" were some quantum of information less than probable cause, what the police knew in this case before they crossed Mr. Ball's threshold would not suffice. See, e.g. , Evans v. United States , 122 A.3d 876, 881 (D.C. 2015) (declining to address "the potential implications of Brigham City " and concluding that "[e]ven applying a less stringent reasonable-belief standard, ... the police did not have adequate reason to believe that immediate entry was necessary to provide emergency aid.").

In explaining the police's justification for making a warrantless entry, the majority opinion effectively counts many times over the same reason: the fact that disturbing noise was heard coming from the apartment. Ante at 25-26. But the majority opinion glosses over the fact that there were three different descriptions of this noise credited by the trial court. Only Officer Kniseley provided the description on which the majority opinion rests its analysis. By contrast, his partner, Officer Davis, whose testimony the trial court also credited, only heard what sounded like "commotion"; and both officers testified that the 911 caller said he heard yelling that sounded like a "fight." See Evans , 122 A.3d at 881 (for the proposition that "[t]he collective knowledge doctrine 'must apply equally to information augmenting or diminishing the objective basis the police have for conducting a seizure' " (citing Turner v. United States , 623 A.2d 1170, 1172 n.2 (D.C. 1993) ).

Officer Davis only perceived the woman who answered the door to be "in a daze."

This narrative, presented for the first time at the suppression hearing a year-and-a-half after the arrest, is inconsistent with the affidavit in support of Mr. Ball's arrest. Other than noting the fact of a 911 call, it contains no information to support a determination that the police had probable cause to believe they needed to enter Mr. Ball's apartment to provide emergency aid. Instead, the Gerstein indicates that the police entered the apartment on consent.

The majority opinion suggests that it is impermissible "dissection" to examine the totality of what the police knew along a timeline to determine whether the information they possessed ever rose to the level of probable cause so as to justify a warrantless entry to provide emergency aid-or whether their cause for mere suspicion remained static or even dissipated. Ante at 25-26 (citing Oliver , 656 A.2d at 1166 ). But this is precisely what we have said courts should do in assessing the evidence known to the police. Oliver , 656 A.2d at 1165 (explaining that in assessing whether the police may make a warrantless entry under the emergency aid exception, "[f]acts ... must be examined in the context and sequence in which they occur."). See, e.g. , Washington v. United States, 585 A.2d 167 (D.C. 1991) (discussed infra at 26-27); Douglas-Bey v. United States , 490 A.2d 1137, 1138 (D.C. 1985) (police had initial authority to make warrantless entry pursuant to emergency aid exception where they received a report of shooting at house and arrived to see the door ajar, making visible a shoe and a pool of blood; but police did not have authority to conduct a further search of the apartment without a warrant after they failed to discover anyone in need of assistance within).

Thus this case is distinguishable from three of the four nonbinding decisions from other jurisdictions the majority opinion cites to support its holding in the absence of supporting precedent from the Supreme Court or this court. Ante at 27-28 (citing United States v. Jenkins , 329 F.3d 579 (7th Cir. 2003) ; Commonwealth v. Davido , 630 Pa. 217, 106 A.3d 611 (2012) ; State v. Sharp , 193 Ariz. 414, 973 P.2d 1171 (1999) (en banc ) ). In those cases, police suspicion only heightened because no one came to the door to open it when the police arrived to conduct their inquiry. Jenkins , 329 F.3d at 580 ; Davido , 106 A.3d at 616-17 ; Sharp , 973 P.2d at 1175.

Cf. Robinson v. United States , 76 A.3d 329, 338-39 (D.C. 2013) (reaffirming that citizens have the right not to speak to the police).

In the fourth nonbinding case cited by the majority opinion, United States v. Barone , the Second Circuit held long before Payton or Brigham City that the police were authorized to enter an apartment after hearing screams from inside. 330 F.2d 543, 544 (2d Cir. 1964). But even in that case, the police had greater cause for concern: after knocking on the door, they were asked repeatedly by a male voice to identify themselves, but they were then greeted at the door by a woman with no sight of the man. Id. at 545. In this case the police heard yelling "as if" a woman was struggling and in pain and then were greeted at the door by a woman and saw another woman behind her in the apartment. The police had no reason to believe anyone else was in the apartment.

Quoting an earlier part of the court's opinion addressing a different exception to the warrant requirement (not the emergency aid exception later discussed), the majority opinion suggests that this court's holding in Washington was narrower-that the court only determined that the police once in defendant's bedroom could not proceed to search the room after they saw the defendant sitting with her son on the bed. Ante at 26-27; 585 A.2d at 170. Even if this had been the court's holding, it would support suppression in this case, given that the police in this case likewise saw nothing once the apartment door opened to substantiate their suspicion that any one was in need of emergency aid. In fact, however, as discussed above, when conducting its analysis under the emergency aid exception, this court expressly held that the forcible entry into the defendant's bedroom was not authorized.

The majority opinion asserts that "[a]ppellant and the dissent argue that the police could have and should have obtained a warrant before entering his apartment" and in so doing "conflate the emergency aid exception with rationales underlying the other exigent circumstance exceptions." Ante at 28. I take no position as to whether the police could have obtained a warrant. My point is that they had no authority to enter Mr. Ball's home without one. And this determination is not based on any "conflation" of exceptions to the warrant requirement; it is premised on the constitutional rule that if the police do not have consent and do not legitimately fall under any exception to the warrant requirement, they cannot enter a home without a warrant. Supra at 30-31.