**Herman R. SPEIGHT, Appellant,**

v.

**UNITED STATES, Appellee.**

**Gary E. SMITH, Jr., Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 94–CF–1241, 94–CF–1358.**

District of Columbia Court of Appeals.

Argued Nov. 16, 1995.

Decided Feb. 1, 1996.

Appeals from the Superior Court of the District of Columbia, Judith E. Retchin, Trial Judge.

Miriam Ruttenberg, with whom C. Russell Twist, appointed by this court, appeared on the brief, Washington, for appellant Herman Speight.

Harley J. Daniels, appointed by this court, Washington, for appellant Gary E. Smith, Jr.

Magdalena A. Bell, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before FERREN, FARRELL, and REID, Associate Judges.

FERREN, Associate Judge:

A jury found appellant Gary E. Smith, Jr. guilty of possession with intent to distribute PCP, D.C.Code § 33–541(a)(1) (1993 Repl.), and possession with intent to distribute marijuana, *id.* § 33–541(a)(1). The jury found appellant Herman R. Speight guilty of possession with intent to distribute PCP while armed, *id.* §§ 33–541(a)(1), 22–3202 (1989 Repl.); possession with intent to distribute marijuana, *id.* § 33–541(a) (1989 Repl.); possession of an unregistered machine gun, *id.* § 6–2311(a) (1989 Repl.); possession of an unregistered pistol, *id.* § 6–2311(a); two counts of possession of ammunition, *id.* § 6–2361(3) (1989 Repl.); and possession of a firearm during a crime of violence or dangerous offense, *id.* § 22–3204(b) (1989 Repl.). Appellants argue on appeal that the trial court erred by denying their respective (1) motions to suppress and (2) motions for judgment of acquittal based on insufficient evidence of constructive possession of the drugs and weapons found in the automobile they were near when arrested. We affirm.

**I.**

On February 5, 1993, at approximately 9:30 p.m., an anonymous caller informed police about a man with a gun in the area of 11th Street and Park Road, N.W. The caller described two black males, one wearing a white cap, jeans, and a red hooded sweatshirt, and the other wearing jeans, a black coat with fur around the collar, and a black cap. The caller said the two suspects had placed guns and drugs in a blue Dodge Aspen, with a given license plate number, parked near the San Miguel restaurant in the 3300 block of 11th Street.

Officers William Witkowski and Darryl Green arrived on the scene within two or three minutes of receiving the caller's information radioed to them in their patrol car nearby. As the officers approached the 3300 block of 11th Street, they saw a blue Dodge Aspen with a license plate number that matched the tag number described over the police radio. The officers then saw two men walking across the street from the 3300 block to the 3400 block of 11th Street. One of the men, later identified as Smith, was wearing a white cap, jeans, a red hooded sweatshirt, and a black jacket over the sweatshirt; the other, later identified as Speight, was wearing jeans, a black coat with fur around the collar, and a black cap. Although the officers observed a few other persons nearby, no one else in the area at that time wore clothing that matched the anonymous caller's descriptions.

When the officers first saw appellants, Smith was walking approximately five to ten feet in front of Speight as the two crossed the street. As the uniformed officers ap-

proached appellants in a marked police car, Smith continued walking north and entered a nearby convenience store, while Speight remained near 11th and Park Road where the police had first observed him. The officers stopped both appellants and brought them together in the middle of the block.

Officer Witkowski, who performed a protective pat-down of Smith, felt keys in Smith's pants pocket but discovered no drugs or weapons during the frisk. In stopping Speight, Officer Green learned Speight's name, address, and Social Security number but, during a frisk, found no drugs or weapons. Officer Dino McFadden, also responding to the radio broadcast, then arrived and informed Officer Witkowski that a WALES check on the Dodge Aspen revealed that Speight was the registered owner. Officer Witkowski learned that the frisk of Speight did not yield any car keys, so Witkowski asked Smith whether he had any keys. When Smith replied that he did not, Witkowski reached into Smith's pocket and removed a set of keys.

Officer Witkowski recognized that the keys belonged to a Chrysler or Dodge vehicle and, with Green, walked over to the Dodge Aspen about a block away. As the officers began to examine the outside of the car, they smelled the odor of PCP emanating from the partially open passenger side window. The officers opened the car with the keys seized from Smith's pocket.

Under the car's front seat the officers discovered an opaque GAP shopping bag containing 23 plastic heat-sealed bags, each of which (according to later tests) contained marijuana laced with PCP. In the center console of the vehicle, the police found a plastic container with a fully-loaded .38 caliber revolver and a fully-loaded magazine for a semiautomatic weapon. In the trunk the officers discovered a Glock .9–millimeter semiautomatic handgun, a gallon-size glass jar that smelled of PCP, and a box of heat-sealable sandwich bags. The officers then informed Speight and Smith that they were under arrest.

While Speight was on his way to the police station, he asked the officer "who had called him in." Upon arriving at the police station, Speight told the officer that he knew who had snitched on him because he had seen the person "call[ ] him in on the pay phone."

When Smith arrived at the police station, he asked an officer what he was charged with doing. The officer replied with the charges against him, whereupon Smith responded, "There ain't no way I can beat this shit, can I?"

## II.

■ We first consider appellants' contention that the trial judge erred in denying their respective motions to suppress evidence. In order to determine the admissibility of the drugs and weapons found in the Dodge Aspen, we initially must evaluate whether the police had a reasonable, articulable suspicion justifying the initial stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We conclude that the detailed anonymous phone tip, the corroboration of innocent details of the tip, and the caller's report that the suspects possessed weapons—when considered together—provided the police with reasonable suspicion to stop and frisk appellants.

■ Second, we address the scope of the frisk. We conclude that the seizure of the keys from Smith's pocket exceeded the scope of a permissible *Terry* frisk because, at the time the keys were seized, the officer did not have reason to believe they were a weapon or contraband. The fact that Smith had the keys to the car, therefore, could not lawfully contribute to establishing probable cause to support the officers' search of the car. We also conclude, however, that Smith's possession of the car keys was evidence admissible at trial because the keys inevitably would have been discovered incident to appellants' subsequent, lawful arrest.

■ Third, we consider whether the Fourth Amendment allows the police to conduct a warrantless search of a vehicle lawfully parked on a public street when there is probable cause to believe the vehicle contains weapons and contraband. We conclude that the officers legally may search such a vehicle based on probable cause without a warrant,

and that, in this case, the information lawfully available to the officers at the time they searched the Dodge Aspen constituted probable cause.

■ Finally, we conclude that the combination of a corroborated, detailed, anonymous tip, when coupled with the discovery of weapons and illegal drugs in the car, gave the police probable cause to arrest appellants, without consideration of the illegally seized keys. We therefore affirm the trial court's denial of appellants' motions to suppress the physical evidence.

**A. Reasonable Suspicion Justifying a *Terry* Stop**

■ The question whether the officers had reasonable suspicion justifying a *Terry* stop is a mixed question of fact and law. On appeal, this court accepts the trial court's factual findings unless they are clearly erroneous but makes an independent legal conclusion as to whether there was reasonable suspicion for the stop. *See Cauthen v. United States*, 592 A.2d 1021, 1022 (D.C.1991); *Brown v. United States*, 590 A.2d 1008, 1020 (D.C.1991).

■ A police officer must have a reasonable, articulable suspicion that criminal activity is afoot before that officer lawfully can stop (or seize) an individual without that person's consent. *See Terry*, 392 U.S. at 30, 88 S.Ct. at 1884. "Reasonable suspicion, like probable cause, is dependant upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). Courts must consider the totality of the circumstances in assessing whether the police had sufficient justification for a *Terry* seizure. *See id.; Illinois v. Gates*, 462 U.S. 213, 241, 103 S.Ct. 2317, 2333–34, 76 L.Ed.2d 527 (1983); *Mayes v. United States*, 653 A.2d 856, 861 (D.C. 1995).

We have upheld *Terry* seizures in previous cases when the content of the information the police acquired was equal to, or less than, the information the officers had here. *See, e.g., Turner v. United States*, 623 A.2d 1170, 1172 (D.C.1993) (FBI wiretap reported that black male named Carlos, in red Nissan 300 ZX with identified license number, was planning to transfer firearm for use in killing someone; stop upheld although suspect police detained was not suspect described in radio broadcast); *Offutt v. United States*, 534 A.2d 936, 937–38 (D.C.1987) (police informant reported suspect was 6′3″ tall, weighed 240 pounds, was wearing particular attire, was located on ninth floor of specified building, and had access to guns and drugs); *Groves v. United States*, 504 A.2d 602, 603–04 (D.C. 1986) (apparent eyewitness caller gave location of suspect and described green Pontiac with white vinyl top); *Lawson v. United States*, 360 A.2d 38, 39–40 (D.C.1976) (per curiam) (apparent eyewitness caller told police suspect was currently at phone booth on particular corner, was wearing blue jeans, and had grey beard).

Appellants argue that these prior cases are distinguishable from the present case because the informants there were not anonymous; the callers either were known to be reliable because they were working with the police, or they presumably were reliable because they apparently were eyewitness callers. *See Cauthen*, 592 A.2d at 1023 (noting that "when the citizen appears to have personally observed a crime, 'the reliability of his or her information is greatly enhanced' ") (quoting *Allen v. United States*, 496 A.2d 1046, 1048 (D.C.1985)). Here, in contrast, the police had no information about the informant's reliability before using the reported descriptions as the basis for stopping appellants.

This case, therefore, presents us with the kind of detailed information commonly used to justify a lawful *Terry* stop, but the anonymous source of the information presents a problem: whether, considering the combined "content of information possessed by police and its degree of reliability," the police possessed reasonable suspicion, under the totality of the circumstances, to stop the suspects. *See White*, 496 U.S. at 330, 110 S.Ct. at 2416 ("if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable"). The anonymous caller provided

the police with detailed information regarding the clothing the suspects were wearing, their present location, and the model, color, and license plate number of their nearby vehicle. The caller also alerted police to the fact that the suspects had access to weapons. The anonymous caller, however, did not provide police with any prediction about the suspects' future behavior or with any other indication that the caller was privy to inside information about the suspects. Nor was there any indication that the caller reporting the suspects to the police was an eyewitness to a recent crime.

In *White,* the Supreme Court recognized that an otherwise unreliable tip gains reliability once it is corroborated, but the Court stressed that, to demonstrate the tip's reliability, the corroborating information should be information other than "easily obtained facts and conditions existing at the time of the tip." *Id.* at 332, 110 S.Ct. at 2417 (quoting *Gates,* 462 U.S. at 245, 103 S.Ct. at 2335). The Court reasoned that "[a]nyone could have predicted [that a car precisely matching the caller's description was in front of the 235 building] because it was a condition presumably existing at the time of the call." *Id.* The anonymous caller's ability to predict future behavior, in contrast, provided "reason to believe not only that the caller was honest but also that he was well informed." *Id.* The fact that future events unfolded as the tip had predicted corroborated the tip because the prediction's accuracy "demonstrated inside information—a special familiarity with respondent's affairs." *Id.* The Court, however, did not "adopt a categorical rule requiring the corroboration of predictive information as a precondition to reliance on anonymous tips." *United States v. Clipper,* 297 U.S.App.D.C. 372, 377, 973 F.2d 944, 949 (1992), *cert. denied,* 506 U.S. 1070, 113 S.Ct. 1025, 122 L.Ed.2d 171 (1993); *see also Cauthen,* 592 A.2d at 1025 ("*White* establishes no mandatory condition that a tip predict future activity to be reliable"); *United States v.*

*(Anthony) Johnson,* 64 F.3d 1120, 1125 (8th Cir.1995) (*White* "does not create a rule requiring that a tip predict future action"); *United States v. Gibson,* 64 F.3d 617, 623 (11th Cir.1995) ("[W]e agree ... that *White* does not prevent law enforcement officers from relying and acting on anonymous tips when the information to be corroborated does not refer to future actions but instead details present circumstances."); *United States v. Bold,* 19 F.3d 99, 104 (2d Cir.1994) ("There is nothing in *White* that precludes police from acting on an anonymous tip when the information to be corroborated refers to present rather than future actions."). Rather, the Court continued to rely on the "totality of the circumstances" where "the whole picture ... must be taken into account when evaluating whether there is reasonable suspicion." *White,* 496 U.S. at 330, 110 S.Ct. at 2416 (internal quotations and citations omitted).

After *White,* this court in both *Cauthen,* 592 A.2d at 1025 n. 8, and *Brown,* 590 A.2d at 1023, suppressed evidence resulting from *Terry* stops supported solely by static information supplied by anonymous tipsters.[1] In *Cauthen,* the caller told police that "three or four individuals were selling drugs at the corner of Fourteenth and Buchanan Streets, N.W." *Cauthen,* 592 A.2d at 1021. In *Brown,* the caller indicated that "a black male, approximately 5'6" in height, wearing a white shirt with dark writing on the front and blue jeans," was selling drugs at the corner of 17th and Euclid Streets, N.W. *Brown,* 590 A.2d at 1010. In both cases, we held that the police lacked reasonable suspicion to stop the suspects.

There are significant differences, however, between the present case and our decisions in *Cauthen* and *Brown.* In *Cauthen,* there was no physical description of the individuals involved, and the police did not arrive at the scene until at least fifteen minutes after the

---

1. We previously had observed that "[t]his court on many occasions, in widely varied factual settings, has upheld stops and protective frisks based entirely on information provided by anonymous citizens." *Allen v. United States,* 496 A.2d 1046, 1049–50 (D.C.1985) (anonymous tip informed police that a man wearing a pink shirt, blue jeans, and Nike tennis shoes had received drugs from the passenger side of an orange Pontiac that was parked at the corner of Fifth and O Streets, combined with the corroboration of innocent details, the mobility of the vehicle, and the flight of the Pontiac upon the police officers' arrival, established probable cause for arrest).

radio broadcast. *See Cauthen,* 592 A.2d at 1021, 1023. In *Brown,* the description of the suspect was so vague that it could have described many of the numerous persons in the area, and the person the police stopped differed significantly from the person described in the radio broadcast. *See Brown,* 590 A.2d at 1018. In fact, we noted in *Brown* that "no meaningful similarities have been positively established except that Brown, like the seller, is a black male." *Id.* at 1019.[2]

We further distinguish this case from *Cauthen* and *Brown* because the anonymous tip here, unlike the tips in *Cauthen* and in *Brown,* implicated a risk to public safety by alerting police that the individuals described had access to a gun.[3] Fourth Amendment *Terry* stop analysis balances the "need to search or seize against the invasion which the

search or seizure entails." *Michigan v. Long,* 463 U.S. 1032, 1046, 103 S.Ct. 3469, 3479, 77 L.Ed.2d 1201 (1983) (internal brackets omitted) (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. at 1879).

Although this is a close case, we believe the report that an individual was armed—potentially implicating the safety of both police officers and the public—combined with the officers' corroboration of an extremely detailed description minutes after hearing the radio broadcast, justified the intrusion involved in briefly detaining and frisking appellants.[4]

### B. Permissible Scope of the *Terry* Stop; Seizure of the Car Keys from Smith

Appellants argue next that, even if the police had reasonable suspicion to stop and

---

**2.** In *United States v. (Morris) Johnson,* 540 A.2d 1090, 1090 (D.C.1988), police received information from an anonymous caller that "a subject [was] trying to sell a gun out of an orange Volkswagen that was parked in the area of 23rd and Savannah Street." The court noted that it would be virtually impossible for the police to corroborate any but the most innocent details of the information. Further, the call-in suggested ongoing crime involving the exchange of guns between persons inside the Volkswagen. "The potential mobility of the car, moreover, would have suggested to a reasonable police officer that closer observation of the two men or delayed investigation risked the recovery of any gun." *Id.* at 1092. The fact that the tipster was apparently an eyewitness to the crime, that a mobile vehicle was involved, and that guns reportedly were present combine to distinguish *Johnson* from *Cauthen* and *Brown.*

**3.** At oral argument, appellants' counsel noted that an anonymous tip may be prompted by a wide variety of motives. *See Brown,* 590 A.2d at 1015. Counsel hypothesized that allowing officers to conduct a *Terry* stop in the present case would enable drug dealers to vex their competitors merely by anonymously providing the police with a detailed description of their competitors' clothing and locations, and reporting that the competitor was armed. We acknowledge the seriousness of the problem counsel raises. There is always a risk that people may attempt to orchestrate a police investigation to harass persons they dislike. We therefore take very seriously the importance of corroborating the details of a sufficiently detailed anonymous tip before justifying a *Terry* stop on the basis of information supplied by an unknown caller. Although counsel's fears may not be alleviated, some courts have noted that "[t]elephone calls to police stations are generally recorded, and the making of

fraudulent reports is punishable by law." *United States v. Clipper,* 297 U.S.App.D.C. at 379, 973 F.2d at 951; *see* D.C.Code § 4–151 (1994 Repl.) (authorizing fine of $300 or imprisonment of 30 days for communicating false or fictitious reports to the police).

**4.** *Holston v. United States,* 633 A.2d 378 (D.C. 1995), concerned an anonymous tip that a man with a gun was holding a woman at bay near a bronze BMW with a specific license number at a particular location. Police arriving at the scene approximately 15 seconds after the radio broadcast "observed a man bending over into the trunk of an automobile which matched precisely the description given." *Id.* at 382. The man "appeared to be putting something in the trunk, reacted with a startled look, slammed the trunk down and walked away." *Id.* In *Holston,* we intimated that the appellant's furtive gestures corroborated a tip that might otherwise have been inadequate. *See id.* at 382–83. Despite the lack of furtive gestures in the present case, however, we conclude that the totality of the circumstances supports the reasonableness of the stop. *See Gomez v. United States,* 597 A.2d 884, 885 (D.C.1991) (upholding *Terry* stop based on anonymous tip that "subjects were dealing drugs out of a vehicle in the rear of 1223 N Street, N.W." combined with officer's knowledge that it was a high drug area and officer's discovery of two darkened cars in an alley at 10 p.m.); *Moore v. United States,* 468 A.2d 1342, 1344 (D.C.1983) (upholding *Terry* seizure based on anonymous caller's report that "a [black] male, five feet six or seven inches tall, 125 pounds, wearing a white hat and white trench coat, was standing at Sixteenth Street and Good Hope Road, S.E., with a gun in his left rear trouser's pocket," plus officer's observation of a bulge in suspect's left trench coat pocket).

frisk them, the detention exceeded the permissible scope of a lawful *Terry* stop. They say that the police should have told them they were free to leave when the initial frisks revealed no evidence of criminal activity. Smith further contends that the police unlawfully seized the keys to the Dodge Aspen from his pocket since that seizure exceeded the scope of a lawful *Terry* frisk.

■■■■■ Once police make a lawful *Terry* stop, they may reasonably detain the suspect while conducting further investigation. *See Turner*, 623 A.2d at 1173–74. We held in *Turner* that, even after the police had learned the stopped individual was not the reported suspect, the Fourth Amendment allowed police to detain that individual for a few additional minutes in order to clarify that individual's possible involvement in the reported criminal activity. *Id.* Pursuant to a lawful *Terry* stop, moreover, police also may transport an individual to a nearby crime scene for a show-up identification. *See United States v. (Gerald) Lewis*, 486 A.2d 729, 734 (D.C.1985) ("the officer was justified in detaining appellee and returning him to the scene of the crime for a show-up" on basis of reasonable suspicion alone); *District of Columbia v. M.M.*, 407 A.2d 698, 701 (D.C.1979) (reasonable suspicion that appellees were involved in recent robbery justified brief police transport to crime scene one mile away for possible identification by a known eyewitness).

Here, after the frisks yielded no weapons or contraband, appellants were detained for a few minutes while police investigated the Dodge Aspen and, as elaborated below, promptly established probable cause to arrest them both. *See Franklin v. United States*, 382 A.2d 20, 23 (D.C.1978) (upholding detention of fifteen minutes as reasonable under *Terry* ). The trial court, therefore, did not err in upholding the brief extension of the valid *Terry* stop and frisk that occurred here.

■■■ We turn to Smith's contention that the police unlawfully seized the keys to Speight's Dodge Aspen from Smith's pocket during the *Terry* stop. The purpose of a *Terry* frisk is to ensure the safety of police officers by allowing a limited patdown of a stopped suspect to check for weapons. *See Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 2138–39, 124 L.Ed.2d 334 (1993). Police who discover weapons or items readily identified as contraband during the lawful patdown of a suspect may seize such items under the "plain feel" exception to the warrant requirement. *See id.* at 376–77, 113 S.Ct. at 2137–38. Officer Witkowski, however, had no reason to believe the keys he felt in Smith's pocket were contraband or a weapon. Indeed, Witkowski was reasonably certain that what he had felt during the frisk was merely a set of keys. Reaching into Smith's pocket to seize the keys, therefore, exceeded the proper scope of the *Terry* frisk and constituted an unlawful seizure; thus, the keys could not contribute to a finding of probable cause to search the Dodge Aspen.

## C. Warrantless Seizure of Guns and Drugs from the Car Based on Probable Cause: The Automobile Exception

■■■ The next question is whether the police acted lawfully when they proceeded to search Speight's car without obtaining a warrant.[5] The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. In the interests of protecting this fundamental right, the Supreme Court has interpreted the Constitution to incorporate a general rule "that searches and seizures be conducted pursuant to a warrant issued by an independent judicial officer." *California v. Carney*, 471 U.S. 386, 390, 105 S.Ct. 2066, 2068, 85 L.Ed.2d 406 (1985); *see Texas v. Brown*, 460 U.S. 730, 735, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983) (Rehnquist, J.) ("procedure by way of a warrant is pre-

**5.** The government does not challenge the trial court's assumption that Smith has standing to challenge the seizure of contraband from the car, and we therefore assume without deciding that Smith can properly challenge the admissibility of evidence seized from the car. *See In re C.A.P.*, 633 A.2d 787, 792 (D.C.1993) (assuming without deciding that appellant had standing to challenge vehicle search when parties did not raise the issue).

ferred"). Nonetheless, the Supreme Court has recognized a number of exceptions to the warrant requirement: exigent circumstances, hot pursuit, search of the person and surrounding area incident to arrest, search at the national border or "functional equivalent," plain view, and—the exception at issue here—the "automobile exception." *See Brown,* 460 U.S. at 735–36, 103 S.Ct. at 1540 (citing, among others, *United States v. Jeffers,* 342 U.S. 48, 51–52, 72 S.Ct. 93, 95–96, 96 L.Ed. 59 (1951) (exigent circumstances); *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (hot pursuit); *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) (search of person and surrounding area incident to arrest); *Almeida–Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (search at national border or "functional equivalent"); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plain view); *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (automobile exception)).

The Supreme Court announced the automobile exception in *Carroll v. United States,* 267 U.S. 132, 153–54, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925), where the Court stressed that a motor vehicle was different from a "store, dwelling house, or other structure ... because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Id.* at 153, 45 S.Ct. at 285. The Court accordingly held that,

> if the search and seizure without a warrant are made upon probable cause, that is,

upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid.

*Id.* at 149, 45 S.Ct. at 283–84.

The Supreme Court's original justification for the automobile exception focused on the mobility of motor vehicles. *See Preston v. United States,* 376 U.S. 364, 366–67, 84 S.Ct. 881, 882–83, 11 L.Ed.2d 777 (1964) ("Common sense dictates, of course, that questions involving searches of motorcars or other things readily moved cannot be treated as identical to questions arising out of searches of fixed structures like houses. For this reason, what may be an unreasonable search of a house may be reasonable in the case of a motorcar."); *Carroll,* 267 U.S. at 153–54, 45 S.Ct. at 285 (noting that warrantless searches of vehicles may be more reasonable than other warrantless searches given the mobility of motor vehicles). Later Supreme Court cases have stressed that the lesser expectation of privacy in vehicles is also attributable to "the pervasive regulation of motor vehicles" and to the fact that "the passenger compartment of a standard automobile is relatively open to plain view." *Carney,* 471 U.S. at 391–92, 105 S.Ct. at 2069–70; *see Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973).[6] The Court has added that a lesser expectation of privacy in motor vehicles is warranted, moreover, because police-citizen contact with motor vehicles is often necessary to "permit the uninterrupted flow of traffic" and

---

**6.** As a result of the shift in rationale for exception to the warrant requirement from exigent circumstances reflected in vehicular mobility to the lesser expectation of privacy in regulated, relatively open vehicles, the Supreme Court has upheld warrantless inventory searches of vehicles and containers inside vehicles conducted after the vehicles had been impounded in police custody. *See Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970) (warrantless search of car driven to police station after arresting occupants); *Texas v. White,* 423 U.S. 67, 68, 96 S.Ct. 304, 305, 46 L.Ed.2d 209 (1987) (per curiam) (same); *United States v. Johns,* 469 U.S. 478, 486, 105 S.Ct. 881, 886, 83 L.Ed.2d 890 (1985) (warrantless search of packages recovered from pickup truck). In *Michigan*

*v. Thomas,* 458 U.S. 259, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam), the Court considered the propriety of an inventory search conducted after the vehicle had been impounded and its occupants placed in police custody. The Court upheld the search, minimizing the exigency rationale for the automobile exception by explaining that

> the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.

*Id.* at 261, 102 S.Ct. at 3080–81.

to manage vehicles that are disabled, damaged, or in violation of parking ordinances. *South Dakota v. Opperman,* 428 U.S. 364, 368–69, 96 S.Ct. 3092, 3096–97, 49 L.Ed.2d 1000 (1976); *see Cady,* 413 U.S. at 441, 93 S.Ct. at 2528.

Throughout this line of "automobile exception" cases justifying warrantless searches, the Supreme Court has recognized that the Fourth Amendment requires courts to weigh the need for public safety against the protection of privacy interests. In particular, the Court has repeatedly relied on the potential presence of weapons in determining the legality of vehicle searches. *See, e.g., Michigan v. Long,* 463 U.S. at 1046, 103 S.Ct. at 3479 (approving warrantless search of automobile passenger compartment based on reasonable belief that suspect may gain immediate control of weapons); *New York v. Belton,* 453 U.S. at 460, 101 S.Ct. at 2864 (upholding search of car interior incident to arrest as being within area where arrestee might reach for weapon); *Cady,* 413 U.S. at 448, 93 S.Ct. at 2531 (upholding warrantless search of automobile trunk reasonably believed to contain gun). In *Opperman,* for example, the Court noted the importance public safety played in deciding to uphold a warrantless search of a vehicle in *Cady.* According to *Opperman,* the Court in *Cady* had upheld a warrantless search of an automobile towed to a private garage even though no probable cause existed to believe that the vehicle contained fruits of a crime. *The sole justification for the warrantless intrusion was that it was incident to the caretaking function of the local police to protect the community's safety.* Indeed, the protective search was instituted solely because local police "were under the impression" that the incapacitated driver, a Chicago police officer, was required to carry his service revolver at all times; the police had reasonable grounds to believe a weapon might be in the car, and thus available to vandals.

*Opperman,* 428 U.S. at 374, 96 S.Ct. at 3099–3100 (emphasis added). The Court also noted the lack of the probable presence of weapons as a factor in determining that a particular warrantless search of a vehicle was unreasonable in *Coolidge,* 403 U.S. at 460, 91 S.Ct. at 2035 (holding warrantless search illegal where "the objects that the police are assumed to have had probable cause to search for in the car were neither stolen nor contraband nor dangerous"), and in *Preston,* 376 U.S. at 368, 84 S.Ct. at 883 (holding warrantless search illegal where "there was no danger that any of the men arrested could have used any weapons in the car").

The Supreme Court has not yet addressed the question presented here: whether the police may conduct a warrantless search of an unoccupied, operable vehicle lawfully parked on a public street based on probable cause to believe the vehicle contains evidence of a crime.[7] A number of federal circuit courts of appeals, however, recently have sustained such searches.[8] *See United States*

7. Language employed by the Supreme Court—although deciding issues distinct from the question presented here—is sufficiently broad, based on differing rationales, to encompass our ruling today. *See Carney,* 471 U.S. at 394, 105 S.Ct. at 2070–71 (vehicle exception to warrant requirement turns on "the ready mobility of the vehicle, and on the presence of the vehicle in a setting that objectively indicates that the vehicle is being used for transportation"); *Johns,* 469 U.S. at 484, 105 S.Ct. at 885 ("A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent circumstances to justify such a warrantless search.").

8. Cases from this court, taken together, do not provide a clear constitutional ruling on whether a warrant is required before the police may

search an unoccupied vehicle parked in a public place. In *Shreeves v. United States,* 395 A.2d 774, 785–86 (D.C.1978), we upheld a warrantless search of an unoccupied car that the police had probable cause to believe contained evidence of a crime, apparently based on exigent circumstances. In *Spinner v. United States,* 618 A.2d 176, 179 (D.C.1992), we sustained a warrantless search of an unoccupied vehicle based on probable cause when the police could see through the car window what they reasonably believed to be contraband. In *(Troy) Lewis v. United States,* 632 A.2d 383, 388 (D.C.1993), this court suppressed evidence seized from a parked car during a warrantless search, holding that the search did not fall within the search incident to arrest exception to the warrant requirement, without considering whether the police could legally conduct the search based on probable cause without a warrant.

*v. Reed*, 26 F.3d 523, 530 (5th Cir.1994), *cert. denied* —— U.S. ——, 115 S.Ct. 1116, 130 L.Ed.2d 1080 (1995) (holding exigent circumstances justified warrantless search of vehicle parked in driveway); *United States v. Hatley*, 15 F.3d 856, 858–59 (9th Cir.1994) (upholding warrantless search of apparently operable vehicle parked on driveway); *United States v. Foxworth*, 8 F.3d 540, 545 (7th Cir.1993) (upholding warrantless search of car parked in motel parking lot); *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993) ("Under the so-called automobile exception, an automobile on a public street may be searched without a warrant as long as the searching agents have probable cause to believe evidence of a crime will be found in the vehicle."); *United States v. McCoy*, 977 F.2d 706, 710 (1st Cir.1992) ("probable cause alone justifies a warrantless search of a motor vehicle seized without a warrant while parked in a public place, 'whether or not exigent circumstances prevailed at either the time of the seizure or the time of the search'") (quoting *United States v. Panitz*, 907 F.2d 1267, 1272 (1st Cir.1990)); *United States v. Wider*, 293 U.S.App.D.C. 16, 19, 951 F.2d 1283, 1286 (1991) (upholding warrantless search of suspect's unoccupied vehicle parked 35 feet from place where suspect was arrested).[9]

9. The present case does not require us to decide, and we express no opinion on the question, whether the Fourth Amendment requires the police to obtain a warrant to search a vehicle of any kind parked on private property. *See Shreeves*, 395 A.2d at 785 (upholding warrantless exigent circumstances search of vehicle parked on private property).

10. We reiterate that the Supreme Court, in developing some aspects of the automobile exception, has said that the inherent mobility of automobiles created exigent circumstances, and that the Court, when developing other aspects of the automobile exception, has noted that the Fourth Amendment does not require exigent circumstances to uphold a warrantless automobile search. *Compare Opperman*, 428 U.S. at 367, 96 S.Ct. at 3096 ("the inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible") with *Johns*, 469 U.S. at 484, 105 S.Ct. at 885 ("A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent circumstances to justify

The principles established in the Supreme Court's "automobile exception" cases, as applied to the facts here, dictate the result here; they demonstrate that the police acted reasonably, based on probable cause without need for a warrant, when searching the Dodge Aspen. First, the police were faced with exigent circumstances.[10] The Dodge Aspen was parked on a public street and appeared capable of being driven away at any moment. Although the police had detained Speight and Smith, nothing prevented confederates or adversaries from gaining access to the car. *See Thomas*, 458 U.S. at 261 n. 2, 102 S.Ct. at 3081 n. 2 (noting exigency in the fact that "there was a clear possibility that the occupants of the vehicle could have had unknown confederates who would return to remove the secreted contraband"). Furthermore, the report that the vehicle contained weapons justifiably increased the level of concern for public safety.[11] Finally, the intrusion involved in searching a car parked on a public street is only minimally greater than the intrusion required when police hold a car until they can obtain a search warrant. In *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the Supreme Court upheld the warrantless search of a car lawfully transported to the police station. The Court reasoned:

such a warrantless search.") and *Thomas*, 458 U.S. at 261, 102 S.Ct. at 3080 (noting that finding of exigent circumstances is not required to uphold inventory search of vehicle in police custody). Without deciding the exact nature of the exigent circumstances component of the warrantless search of an unoccupied vehicle parked in a public place, we conclude that the facts of this case—an apparently mobile vehicle reported to contain weapons parked on a public street—provide ample support for a finding of exigent circumstances.

11. Officer Witkowski listed the presence of weapons as one of the considerations he relied on in deciding not to seek a warrant. When the court asked the officer why he did not obtain a warrant to search the car, he candidly replied:

Quite frankly, Your Honor, I thought we had enough, with all the pieces of the puzzle, to meet probable cause. We had the defendants that matched the lookout. We had the vehicle where it belonged. The vehicle had the same license plate number.... Plus, there was weapons involved. At the time, I felt it was best to just go ahead.

For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

*Id.* at 52, 90 S.Ct. at 1981. In the present case, the intrusion involved in detaining the car parked on the street while officers obtained a warrant would not have been much less than the intrusion occasioned by the officers' earlier, warrantless search of the vehicle based on probable cause.[12]

Having concluded that the police may conduct a warrantless search of an apparently functional vehicle parked on a public street if they have probable cause that the vehicle contains weapons, we now consider whether the police here had such probable cause.

We note, initially, that the police invaded no privacy interest by approaching a vehicle parked on a public street and smelling the air emanating from the vehicle. An individual has a reasonable expectation of privacy in property only when manifesting a subjective expectation of privacy that society accepts as objectively reasonable. *See California v. Greenwood,* 486 U.S. 35, 39–40, 108 S.Ct. 1625, 1628–29, 100 L.Ed.2d 30 (1988) (no reasonable expectation of privacy in garbage placed outside home). Nothing appellants did manifested a subjective expectation of privacy in the outside of the Dodge Aspen parked on a city street, and in any event society would not accept any such expectation as objectively reasonable. *Cf., e.g., Texas v. Brown,* 460 U.S. at 740, 103 S.Ct. at 1542 ("There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." (citations omitted)). Appellants had no expectation of privacy in the distinctive smell of PCP emanating from the vehicle, and thus the police officers' smelling the air coming from the

vehicle did not implicate any constitutionally protected privacy interest. *See United States v. Ludwig,* 10 F.3d 1523, 1527 (10th Cir.1993) (holding that even "random and suspicionless dog sniffs are not searches subject to the Fourth Amendment"); *United States v. Friend,* 50 F.3d 548, 552 (8th Cir. 1995) ("legitimate expectation of privacy regarding [defendant's] parked car did not extend to the uniquely limited intrusiveness of a dog sniff").

The smell of PCP emanating from the car partially corroborated the anonymous tip. The smell of PCP not only gave the police probable cause to believe that an additional fact alleged in the tip was true, *see Minnick v. United States,* 607 A.2d 519, 525 (D.C. 1992) (distinctive smell of PCP alone sufficient probable cause to search occupied vehicle), but also suggested that the tipster had inside information about the contents of the car. The PCP smell, therefore, provided the anonymous tip with a greater indicia of reliability than it had demonstrated previously. By the time the police searched the vehicle, the tip reliably had described the appearance of the suspects, and the location of the vehicle, and thus reasonably had suggested to the police that the car contained drugs. The tip, therefore, also provided police with increasingly reliable information that the car contained weapons.

In sum, the combination of the informant's detailed tip—now partially corroborated by inside information—the report of weapons in the car, and the smell of PCP emanating from the car gave the police probable cause to believe that the blue Dodge Aspen contained contraband. The trial court, therefore, did not err in denying appellants' motions to suppress the guns and drugs evidence obtained from the search of the Dodge Aspen.

## D. Probable Cause to Arrest

During the *Terry* stop, police officers learned Speight's identity and determined that Speight owned the Dodge Aspen that

---

12. The fact that the police used the keys illegally recovered from Smith to open the car is of no consequence. Upon establishing probable cause to search the car, the police were justified in opening the car by any reasonable means—and certainly would have opened the car—even if they had not improperly seized the keys.

later was discovered to contain guns and drugs. The police also discovered the keys to the Aspen in Smith's pocket, although we already have noted that this seizure was unlawful and thus could not contribute to a finding of probable cause to search the vehicle or to arrest Smith. See *supra* Part II.B.

Once, however, the police lawfully discovered drugs and weapons in the car—which they had probable cause to search without reference to the keys found on Smith—the anonymous callers' detailed tip gained substantially greater indicia of reliability. The fact that the caller accurately predicted drugs and weapons would be found in the car indicated that the caller had inside information. A detailed tip from a reliable informant may provide police with probable cause to arrest the described suspects—which was the case here. See *Hill v. United States*, 627 A.2d 975, 979–80 (D.C.1993) (officer had probable cause to arrest based on undercover officer's particularized description of suspect's clothing and exact present location); *Parker v. United States*, 601 A.2d 45, 48–49 (D.C.1991) (police had probable cause to search car where citizen flagged down police, gave her name and address to officer, and informed police that "a man in a brown Plymouth with District of Columbia license plates was about to make a drug drop at a specified location a few blocks away").

Even without regard to the keys connecting Smith to Speight's car, therefore, the police had enough information from the tip, coupled with Smith's presence in the vicinity of the car, to justify his arrest, as well as Speight's arrest, based on probable cause.[13]

Once Smith was lawfully arrested, the police could have lawfully searched his person incident to that arrest. At that time, the police inevitably would have discovered in Smith's pocket the keys to Speight's car. Accordingly, although the police had illegally

seized those keys from Smith too early, during the period of detention justified only by *Terry*, that premature seizure did not preclude admission of the keys in evidence at Smith's trial, because the eventual probable cause to arrest, under the circumstances here, erased the illegality. See *District of Columbia v. M.M.*, 407 A.2d at 702 (camera police unlawfully seized after frisk, but before arresting appellees, was admissible in part because appellees were continuously in police custody and camera would have been seized incident to lawful arrest). Smith, therefore, has no basis for arguing that the keys must be suppressed. As the Supreme Court noted in *Nix v. Williams*, 467 U.S. 431, 447, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984), "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings."

## III.

Appellants contend, finally, that the trial court erred in denying their motions for judgment of acquittal, claiming the evidence was insufficient to support a finding that they possessed the drugs and weapons police discovered some distance away in the Dodge Aspen.

We recently explained the standards governing a motion for judgment of acquittal:

In ruling on a motion for judgment of acquittal alleging insufficiency of the evidence, the trial court must review the evidence in the light most favorable to the government. *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987). If a reasonable juror, evaluating that evidence and drawing permissible inferences therefrom with-

---

13.  *United States v. (Gerald) Lewis*, 486 A.2d 729, 733–34 (D.C.1985), presents a different situation from the one found here. In that case, police had reasonable suspicion to stop the suspect but lacked probable cause to arrest him. Nonetheless, police searched the suspect's backpack and discovered the crime victim's yellow backpack contained inside. Without discovering the yellow backpack, the police would not have had

probable cause to arrest the suspect. In contrast, independent and lawful sources of evidence—the caller's detailed description of Speight and Smith coupled with the drugs and guns evidence recovered from the car—provided the police here with probable cause to arrest Speight and Smith. The police did not need the evidence illegally seized from Smith—the keys—to establish probable cause to arrest appellants.

out engaging in conjecture or speculation, *must* have some reasonable doubt as to the existence of any essential element, the motion should be granted. *Id.; McClain v. United States*, 460 A.2d 562, 567 (D.C. 1983). This court "employs the same standard as that applied by the trial court in determining whether the evidence was sufficient to convict." *Curry, supra*, 520 A.2d at 263.

*McKinnon v. United States*, 644 A.2d 438, 441 (D.C.1994) (emphasis in original).

 In this case, the government proceeded under a theory of constructive possession. "To establish constructive possession, the government must prove that the accused (1) knew the location of the [contraband], (2) had the ability to exercise dominion and control over [it], and (3) intended to exercise such dominion and control." *Earle v. United States*, 612 A.2d 1258, 1265 (D.C.1992) (omitting citations). The police stopped Smith and Speight in close proximity to each other and to the Dodge Aspen containing the contraband.[14] The smell of PCP emanating from the car indicated it was likely that appellants knew the car contained drugs.

As to the second factor, the record shows that both appellants had the ability to exercise dominion and control over the contents of the vehicle. The police discovered that Speight was the registered owner of the vehicle and that Smith possessed the keys to it.

Finally, there was evidence that appellants intended to exercise dominion and control over the guns and drugs. Their respective incriminating statements "indicate[d] consciousness of guilt." *See (James) Speight v. United States*, 599 A.2d 794, 798 (D.C.1991). Smith lied to Officer Witkowski about his possession of the car keys and later expressed his belief that he would be found guilty of the charges against him. Speight's statement virtually acknowledged his participation in activity that would lead someone to report him to the police. We have held that "evidence linking the accused to an ongoing criminal operation" may provide evidence of intent to exercise dominion and control over contraband. *Burnette v. United States*, 600 A.2d 1082, 1084 (D.C.1991) (per curiam) (quoting *Davis v. United States*, 564 A.2d 31, 44 (D.C.1989).[15]

\* \* \*

The trial court did not err in admitting the evidence presented at trial, and the evidence sufficiently supported appellant's convictions.

*Affirmed.*

---

**14.** The trial court excluded evidence regarding the content of the information in the police "lookout" on hearsay grounds. No evidence was presented at trial that an anonymous caller informed police that the appellants had placed guns and drugs in the Dodge Aspen.

**15.** Although appellants do not explicitly raise the point, we note that the evidence was also sufficient for the jury to infer the intent to distribute. *See Earle*, 612 A.2d at 1270 (upholding conviction for possession with intent to distribute when drugs and paraphernalia were packaged in a manner consistent with distribution, in amounts regularly sold and purchased on the street).