*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CF-0828

ANDRE MILLER, APPELLANT,

V.

UNITED STATES, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2022-CF3-006440)

(Hon. Jason Park, Trial Judge)

(Argued June 3, 2025                                    Decided November 6, 2025)

*Victoria Hall-Palerm*, Public Defender Service, with whom *Samia Fam*, *Jaclyn S. Frankfurt*, *Alice Wang*, and *Shilpa S. Satoskar*, Public Defender Service, were on the briefs, for appellant.

*Katherine M. Kelly*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *John P. Mannarino*, and *Megan McFadden*, Assistant United States Attorneys, were on the brief, for appellee United States.

*Ashwin P. Phatak*, Principal Deputy Solicitor General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Thais-Lyn Trayer*, Deputy Solicitor General, and *Tessa Gellerson*, Assistant Attorney General, were on the brief, for appellee District of Columbia.

Before HOWARD and SHANKER, *Associate Judges*, and MCLEAN, *Associate Judge, Superior Court of the District of Columbia.**

SHANKER, *Associate Judge*: In October 2022, appellant Andre Miller crashed his car into a parked car in southeast Washington, D.C.  The owner of the car that Mr. Miller crashed into came out of his house and the two exchanged words.  As Metropolitan Police Department (MPD) officers approached the scene, Mr. Miller fled on foot.  The responding officers chased and ultimately seized Mr. Miller, and they found a gun with a large-capacity magazine in it underneath a vehicle along Mr. Miller's flight route as well as a large-capacity magazine, with ammunition in it, in Mr. Miller's car.

Mr. Miller was charged with multiple firearm-related offenses, including two counts of possession of a large-capacity ammunition feeding device (PLCFD) (D.C. Code § 7-2506.01(b)) and one count of unlawful possession of ammunition based on the lack of a valid registration for a firearm (UA) (D.C. Code § 7-2506.01(a)(3)).  Before trial, Mr. Miller moved to dismiss the PLCFD charges, asserting that the statute violates the Second Amendment to the United States Constitution.  He also moved to suppress all tangible evidence recovered at the scene as having been obtained in violation of the Fourth Amendment to the United States Constitution.

---

* Sitting by designation pursuant to D.C. Code § 11-707(a).

The trial court denied both of Mr. Miller's motions and, following a jury trial, Mr. Miller was convicted of one count of PLCFD and one count of UA, both based on the magazine found in his car.

Mr. Miller appeals, challenging the denial of suppression and, as to only the PLCFD conviction, the sufficiency of the evidence, the trial court's failure to sua sponte instruct the jury on the knowledge element of PLCFD, and the denial of his Second Amendment challenge. After oral argument, the United States moved under D.C. Code § 17-306 for vacatur of Mr. Miller's PLCFD conviction due to a changed position regarding the constitutionality of the statute. Mr. Miller did not oppose the motion and intervenor-appellee the District of Columbia did not object to vacatur of the conviction while maintaining its position that the statute is constitutional. In its motion for vacatur, the government noted that it continued to seek affirmance of Mr. Miller's UA conviction and it further noted, without dispute, that vacatur of the PLCFD conviction would not affect the issues on appeal related to the UA conviction.

We affirm the denial of suppression and thus affirm Mr. Miller's UA conviction. We grant the government's motion for vacatur of Mr. Miller's PLCFD conviction and remand for further proceedings in the trial court. In light of our vacatur of the PLCFD conviction, we decline to address Mr. Miller's claims

challenging, as to that conviction, the sufficiency of the evidence, the omission of a jury instruction regarding knowledge under the PLCFD statute, and the constitutionality of the statute.[1]

## I.    Factual and Procedural Background

After Mr. Miller crashed his car into a parked car and MPD officers who had responded to the scene found a gun with a large-capacity magazine and another large-capacity magazine, Mr. Miller was charged with (1) unlawful possession of a firearm by a felon (D.C. Code §§ 22-4503(a)(1), (b)(1)); (2) carrying a pistol without a license (D.C. Code § 22-4504(a)(2)); (3) two counts of possession of a large-capacity ammunition feeding device (D.C. Code § 7-2506.01(b)); (4) possession of an unregistered firearm (D.C. Code § 7-2502.01(a)); and (5) unlawful possession of ammunition (D.C. Code § 7-2506.01(a)(3)).

---

[1] A ruling by this court that the evidence was insufficient to support Mr. Miller's PLCFD conviction would preclude a future new PLCFD charge. The government, however, avers that, on remand, it will move in the Superior Court for dismissal of the PLCFD count under Super. Ct. Crim. R. 48. We expect that such dismissal will be with prejudice. *See* Super. Ct. Crim. R. 48 ("[D]ismissal is without prejudice unless otherwise stated.").

## A.     Denial of Suppression

Mr. Miller moved to suppress the magazine and ammunition found in his car as fruits of a Fourth Amendment violation.  While acknowledging that, under the "automobile exception" to the warrant requirement, police officers can search a car without a warrant if they have probable cause to believe that the car contains contraband or evidence of a crime, Mr. Miller argued that officers did not have probable cause to believe there was contraband in his car because "[t]hey did not see any illegal items in plain view inside the car."  The government argued that the automobile exception permitted the search of the car because officers had probable cause to believe that the car contained evidence of criminal activity, and that officers saw the magazine in Mr. Miller's car in plain view and therefore could seize the magazine without a warrant.

The evidence at a suppression hearing included the following.  MPD Officer Ethan Way went to the 4000 block of Ninth Street, SE, after receiving a call reporting a traffic crash and a man with a gun.  When Officer Way arrived, he heard someone yelling, "He's got a gun, he's got a gun."  The car that had crashed was sitting diagonally in the middle of the road and the driver was still in the driver's seat.  The driver, later identified as Mr. Miller, got out of the car with a backpack on the front of his body, crossed the street, went behind an SUV, crouched down, dropped the

backpack, and then proceeded up Ninth Street, not "sprinting or running" but "moving with a purpose." Officer Way briefly lost sight of Mr. Miller as he crossed in front of the SUV. When Mr. Miller dropped the backpack, Officer Way neither saw a gun nor heard the sound of a gun hitting the pavement. Officer Way yelled orders to Mr. Miller; in response, Mr. Miller showed his hands but started running.

As Officer Way chased Mr. Miller, he told officers behind him to secure the backpack that Mr. Miller had dropped, while other officers joined Officer Way's chase. Mr. Miller eventually surrendered and officers placed him in handcuffs.

After helping to detain Mr. Miller, Officer Dalton Griffin returned to the scene of the crash and the flight route. Officer Griffin did not testify at the suppression hearing (or at trial), but Officer Way testified about Officer Griffin's actions based on his review of Officer Griffin's body-worn camera footage. According to Officer Way, Officer Griffin recovered the backpack from under the SUV, a search of which revealed nothing of interest to law enforcement.

Another officer, Officer Michael Strong, looked through Mr. Miller's car window. Officer Strong also did not testify at the suppression hearing (although he did testify at trial, *see infra*); again, Officer Way testified at the suppression hearing about what he observed in Officer Strong's body-worn camera footage. As he looked through the driver's window of Mr. Miller's car while shining a flashlight,

Officer Strong exclaimed that he saw a magazine in the car. The body-worn camera footage, which was played at the suppression hearing, shows Officer Strong shining a flashlight through the driver's window and then, approximately six seconds after he began looking through the window, saying words to the effect of, "It's a mag in here . . . . A mag's in here, I see it." On cross-examination, Officer Way agreed that two other officers had looked into the car with flashlights and had not reported seeing a magazine.

The body-worn camera footage does not show the magazine that Officer Strong said he saw. The government, however, introduced a still photograph of what officers saw after they opened the car door:



Based on that photograph, Officer Way testified, and the photograph shows, that the magazine was located between the driver's seat and the frame of the car—to the driver's left, approximately where his hip would be, on the floorboard of the car, wedged between the car seat and the interior of the car. The magazine was positioned so that the side with numbered ammunition holes was facing upward. Based on another photograph taken after the magazine was recovered, Officer Way testified that the magazine was for a Glock 17 nine-millimeter gun and that it was fully loaded with ammunition.

After Officer Strong saw the magazine in the car, he and another officer found a gun under the SUV under which Mr. Miller had tossed his backpack. The gun was "[r]ight next to" the backpack. Inside the gun was a magazine that extended past the gun's handle.

In an interrogation after he was arrested and read his *Miranda* rights, Mr. Miller said that he was involved in a car accident and someone on the scene pulled a gun on him. He then saw the police arriving and he left the scene.

The parties' arguments at the suppression hearing centered, as relevant here, on whether the incriminating nature of the magazine inside Mr. Miller's car was visible in plain view from outside of the car such that officers could enter the car to seize it. After hearing those arguments, the trial court denied Mr. Miller's motion to suppress. The court first found Officer Way credible. The court then found that Officer Strong's flashlight "appear[ed] to be pointed in a downward direction and he's captured on the body-worn camera . . . saying, it's a mag in here; it's a mag in here; I see it." The court found that the magazine was "located on the driver's side of the car, between the driver's door and the driver's seat of the car," and "was positioned so that the portion of the magazine showing the numbers on the side and the holes where one can see whether or not there are rounds were facing upwards,

towards the driver's side window." The court found it "not surprising" that two other officers did not see the magazine, given its position in the car.

The trial court concluded that the recovery of the magazine was justified under the plain-view exception to the warrant requirement because "Officer Strong walked up to the vehicle, looked down, [and] saw the magazine there wedged between the driver's seat and the door"; "[f]rom the way that the magazine was positioned face up, it was very clear that it was a gun magazine"; and "the incriminating evidentiary nature of it was immediately apparent to Officer Strong regardless of his training." The court further noted that the still photograph of the magazine in the car taken after the car door was opened "corroborated" the location of the magazine.

**B.      Trial**

The evidence at trial included the following. Charles Stroud and his son Los Stroud were at their home on the 4000 block of 9th Street, SE, on the evening of October 28, 2022. When they heard a crash outside, Los looked out the window, said "that was my car," and ran outside. Charles ran outside after Los and saw that a silver Toyota had hit Los's black car so hard that it had pushed Los's car onto the curb.

Los, who was "mad," approached the silver Toyota and began talking to Mr. Miller, who was in the driver's seat, alone. Eight to ten other people had also come outside to see what had happened, and one person yelled at, swore at, and threatened Mr. Miller. Charles used his cell phone to take a video of the Toyota's front license plate and Mr. Miller "in case it was a hit and run." Charles testified that Mr. Miller was trying to get his car to move so he could get away, but "the car wouldn't move." Charles then stopped recording because he saw Mr. Miller reach toward the open armrest in the center of the car and take out a black gun, although Mr. Miller did not point the gun at Charles and Charles did not see Mr. Miller point a gun at Los. Charles thought that Mr. Miller was "going to shoot" him, but Mr. Miller instead "just kept messing with the car" while "trying to get away." Charles acknowledged on cross-examination that he had lied to the police on the night of the incident by saying that Mr. Miller had pointed a gun at him.

After Mr. Miller was unable to flee in his car, the police arrived and Mr. Miller began running up Ninth Street with officers chasing behind. Charles did not see a gun in Mr. Miller's hand while Mr. Miller was running or see Mr. Miller place a gun under a car.

Officer Way's trial testimony was generally consistent with his suppression hearing testimony. Officer Strong also testified at trial. He stated that he arrived

around 9:45 p.m. to the 4000 block of Ninth Street, SE, in response to a call. When he arrived, he went to the silver Toyota, stood at the driver's side door, and shined his flashlight inside the vehicle. While pointing his flashlight "down towards the [driver's] seat," Officer Strong saw "a magazine" that was "in between the [driver's] seat and the door frame." He could see the magazine right after he started looking through the car window. Officer Strong noticed that the magazine "appeared to be loaded" and said that he could see the "bullets inside of it because of the shine" of the bullets. Officer Strong testified that when he pointed his flashlight into the car the magazine appeared to him as it did in the still photograph.

After Officer Strong discovered the magazine, his partner told him that there was "something" under the SUV. Kneeling near the SUV and shining his flashlight underneath, Officer Strong saw a handgun under the vehicle, "right next to the bag" that Mr. Miller had discarded. After Officer Strong saw those items, officers entered Mr. Miller's car.

A crime scene analyst testified that he photographed the scene that night, including Mr. Miller's car, which was almost directly across the street from the SUV under which the gun with the extended magazine was found. The analyst photographed the nine-millimeter Glock magazine that was found in Mr. Miller's car, which was loaded and contained seventeen rounds, its maximum capacity. No

fingerprints were found on the magazine found in Mr. Miller's car and the magazine contained an insufficient amount of DNA for any DNA comparison to Mr. Miller's sample.

The government established that on the date of the car crash, Mr. Miller had neither a firearms registration certificate for any firearm nor a license to carry a pistol. The parties stipulated that Mr. Miller had a prior felony conviction and that he knew of that conviction. The government also proved that the silver Toyota was titled and registered in Mr. Miller's name.

The jury found Mr. Miller guilty of one count of PLCFD and one count of UA, both based on the magazine found in his car; it found him not guilty of the remaining charges. The trial court sentenced Mr. Miller to a total of 24 months of imprisonment.

This appeal followed.

## II.     Analysis

In light of our vacatur of Mr. Miller's PLCFD conviction, we address here only Mr. Miller's suppression claim, which bears on his UA conviction. Mr. Miller argues that the plain-view exception to the warrant requirement did not apply to the magazine in his car because the magazine's illegal capacity was not immediately

apparent to the searching officer. We conclude that the trial court correctly denied suppression of the magazine.

### A. Standard of Review

"When reviewing a trial court's denial of a motion to suppress evidence, we defer to the court's factual findings unless they are clearly erroneous, but we review the court's legal conclusions de novo." *Green v. United States*, 231 A.3d 398, 405 (D.C. 2020).

### B. Discussion

Mr. Miller argues that the trial court erred in ruling that the seizure of the magazine and ammunition was justified under the plain-view doctrine. In Mr. Miller's view, the government failed to prove that the illegality of the magazine was "immediately apparent" to Officer Strong when he saw it through the car window. And even though Officer Strong said that he saw a "mag" in the car, Mr. Miller contends that a gun magazine, without more, is neither contraband nor evidence of a crime because gun magazines capable of holding ten or fewer rounds are legal in the District and possession of a handgun is not presumptively unlawful.

We note at the outset that, although the parties' suppression briefing in the trial court addressed the automobile exception to the warrant requirement, the

parties' arguments went a bit sideways at the suppression hearing. What perhaps began as a dispute about whether the magazine's characteristics were visible from outside of the car for purposes of the automobile exception morphed into an argument premised on the shared misunderstanding that if the magazine's incriminating nature was visible to officers from outside of the car, the plain-view exception to the warrant requirement permitted entry into the car to seize the magazine. The trial court then followed suit, ruling that "the plain view exception does apply" based on the court's findings regarding what Officer Strong saw. Now on appeal, the parties have continued down the same path. We take a moment to explain why that path is an errant one.

Officer Strong's viewing of the interior of Mr. Miller's car from the exterior was not a Fourth Amendment event. *Texas v. Brown*, 460 U.S. 730, 739-40 (1983) (plurality opinion) (police officer's "action in shining his flashlight to illuminate the interior of [defendant's] car trenched upon no right secured . . . by the Fourth Amendment"; "There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." (citation modified)). What Officer Strong saw was necessarily in "plain view" in the colloquial sense, in that it was visible without any additional action needed or taken. But this is not a plain-view exception case.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The basic purpose of this Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (citation modified). "When an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Id.* at 304 (citation modified).

Because, however, the touchstone of the Fourth Amendment is reasonableness, the warrant requirement is subject to certain exceptions. *Lange v. California*, 594 U.S. 295, 301 (2021); *see Beachum v. United States*, 19 A.3d 311, 319 (D.C. 2011) ("Generally, a search conducted without a warrant is per se unreasonable under the Fourth Amendment unless it falls within a few specific and well-established exceptions.") (citation modified). For example, if exigent circumstances, such as an emergency or the need to prevent the imminent destruction of evidence, "make the needs of law enforcement so compelling, a warrantless search is objectively reasonable." *Lange*, 594 U.S. at 301 (citation modified). And if officers are otherwise in a location, due to, for example, exigent circumstances or consent, and they see an object that meets the requirements of the plain-view

exception, they may seize that object. *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 65-66 (1992). Thus, "[u]nder the so-called plain-view exception to the Fourth Amendment warrant requirement, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *(Bernard) West v. United States*, 100 A.3d 1076, 1083-84 (D.C. 2014) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).

The plain-view exception does not, however, permit *entry or a search* to effectuate a seizure based on officers' observation of contraband. *Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971) (plurality opinion) ("[E]ven where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure."); *see Horton v. California*, 496 U.S. 128, 134 (1990) ("If 'plain view' justifies an exception from an otherwise applicable warrant requirement, it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches." (citation modified)); *Fogg v. United States*, 247 A.3d 306, 323 n.11 (D.C. 2021) (plain-view exception did not provide probable cause for a search; the exception "only allows for the warrantless seizure of evidence in plain sight" when the exception's requirements are met (citation modified)); *United States v. Green*, 106 F.4th 368, 378 (4th Cir. 2024) (the plain-view exception "cannot by itself justify a search

intruding on protected privacy interests, which means that it does not authorize police officers to enter private premises to seize an item, even one in plain view from a public street" (citation modified)).

It is thus beyond dispute, we think, that if officers had seen a magazine in Mr. Miller's home through a window, absent some other basis (such as exigent circumstances), the officers could not have made a warrantless entry into the home to seize the magazine. "What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused." *Coolidge*, 403 U.S. at 466.

Individuals have some reasonable expectation of privacy, although a reduced one, in the contents of their automobiles. *California v. Carney*, 471 U.S. 386, 390-92 (1985). Thus, under *Coolidge*, when officers see an incriminating object in a car, some basis other than the plain-view exception must justify their warrantless entry into the car to seize it.

This is where the automobile exception to the warrant requirement enters the picture. Under that exception, a warrantless search of an automobile stopped by police officers who have probable cause to believe the vehicle contains contraband is not unreasonable within the meaning of the Fourth Amendment. *Carroll v. United*

*States*, 267 U.S. 132, 149 (1925); *see United States v. Ross*, 456 U.S. 798, 823-24 (1982); *Speight v. United States*, 671 A.2d 442, 450-53 (D.C. 1996).[2] Thus, where an officer sees contraband or evidence of a crime inside a car, it is (as the government argued in its trial court briefing) the automobile exception, and not the plain-view exception, that governs the legality of the officer's entry into the car to seize the item.

The Supreme Court's plurality decision in *Brown* demonstrates this. There, a police officer lawfully stopped a car at a traffic checkpoint. *Brown*, 460 U.S. at 733. The officer then saw in "plain view" a balloon inside the car, which the officer had probable cause to believe contained narcotics. *Id.* at 733-34. The Court stated that the police officer was properly in a position to view the interior of the car, the officer did not know in advance of the location of the item or have the intent to seize it, and it was immediately apparent to the officer that the item was contraband. *Id.* at 741-44. The Court thus applied the plain-view doctrine to uphold the observation

---

[2] The automobile exception applies to immobilized cars. *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (per curiam) ("The justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant." (citation modified)); *id.* at 261 n.2 (with a search conducted on the roadside, before the car has been towed, there is a "possibility that the occupants of the vehicle could have had unknown confederates who would return to remove the secreted contraband").

of the balloon, but it expressly recognized that something additional was needed because *seizure* of the balloon "required a warrantless, physical intrusion into" the defendant's car. *Id.* at 741 n.6. Although the Court did not use the phrase "automobile exception," it cited *Ross*, 456 U.S. 798—an automobile exception case—to support the conclusion that the warrantless intrusion into the car "was proper, assuming that the remaining requirements of the plain view doctrine were satisfied." *Brown*, 460 U.S. at 741 & n.6.[3]

Justice White also addressed this issue in his dissenting opinion in *Washington v. Chrisman*, 455 U.S. 1 (1982). *Chrisman* was not an automobile case, but in explaining the application of the plain-view exception generally, Justice White observed that "seeing something in open view does not, of course, dispose . . . of the problem of crossing constitutionally protected thresholds." *Id.* at 12 n.4 (White, J., dissenting) (quoting Charles E. Moylan, *The Plain View Doctrine: Unexpected Child of the Great "Search Incident" Geography Battle*, 26 Mercer L. Rev. 1047, 1096 (1975)). In the case of a car, Justice White explained, "[t]his problem of 'crossing constitutionally protected thresholds' without a warrant is easily resolved if the so-

---

[3] It is not exactly clear why the Court treated *Brown* as a plain-view-doctrine case. The plurality recognized that the police officer's observation of the suspected contraband from outside of the defendant's car implicated no Fourth Amendment considerations. *Brown*, 460 U.S. at 740. Once that was the case, the plurality could (and it seems should) have proceeded straight to the automobile exception.

called 'automobile exception' to the warrant requirement applies, for that exception justifies a warrantless entry into the automobile to seize contraband in plain view inside the car." *Id.* (White, J., dissenting). Justice White then pointed to the example of *Colorado v. Bannister*, 449 U.S. 1 (1980) (per curiam), where the Court held that an officer's observation of items in plain view inside a car did not violate the occupant's Fourth Amendment rights and that the officer's observations could therefore be used to establish probable cause to search the car; the Court then justified the warrantless intrusion into the car *not* by "relying on the plain-view doctrine" but rather by holding "that the warrantless entry was justified under the 'automobile exception' to the warrant requirement." *Id.* (White, J., dissenting).

Here, then, the question is not whether Officer Strong's observation of the magazine from outside of Mr. Miller's car satisfied the requirements of the plain-view exception such that officers could seize the magazine from the car. The question is whether the observation of the magazine (which did not implicate Mr. Miller's Fourth Amendment rights) gave Officer Strong probable cause to believe that the car contained contraband or evidence of criminal activity, thereby justifying entry into the car under the automobile exception for seizure of the item. *See Ross*, 456 U.S. at 807-08.

As we have noted, however, the parties recognized the applicability of the automobile exception in the trial court, and, ultimately, the issue argued by the parties and decided by the trial court is the same as the issue we must decide under the automobile exception (and the pertinent facts have been developed). That is because the "immediately apparent" requirement for the incriminating nature of an item seen in plain view has been interpreted to mean "probable cause to associate the property with criminal activity." *Umanzor v. United States*, 803 A.2d 983, 999 (D.C. 2002) (quoting *Brown*, 460 U.S. at 741-42); *see Brown*, 460 U.S. at 741-42 (for the plain-view exception to apply, officer must have probable cause to believe item is associated with criminal activity). Moreover, "[t]hough the trial court did not rely on this exception, it is well settled that an appellate court may affirm a decision for reasons other than those given by the trial court." *Harris v. United States*, 260 A.3d 663, 684 (D.C. 2021).[4]

---

[4] That the parties have continued on appeal to frame the issue in this case as implicating the plain-view doctrine does not preclude us from deciding the case on the basis of the automobile exception. The government preserved an automobile-exception argument in the trial court, and the overarching question is whether the trial court erred in denying suppression of the magazine. "That is enough to confer upon us the discretion to consider points in service of that claim, including those that 'the parties did not lock horns over' in their briefs" in this court. *Colbert v. United States*, 310 A.3d 608, 616 (D.C. 2024) (quoting *Jones v. District of Columbia*, 996 A.2d 834, 838, 840-42 (D.C. 2010)) (citation modified). "We ordinarily do not consider points that a party did not squarely present on appeal," but "'when an issue or claim is properly before the court, the court is not limited to the particular legal

With the proper framework now elucidated, we proceed to address the question in this case: whether, when he looked through Mr. Miller's car window, Officer Strong developed probable cause to believe that contraband or evidence of a crime was inside the car. Probable cause "exists when 'a reasonable police officer considering the total circumstances confronting him and drawing from his experience would be warranted in the belief that an offense has been or is being committed.'" *Greenfield v. United States*, 333 A.3d 866, 873 (D.C. 2025) (quoting *Ellison v. United States*, 238 A.3d 944, 950 (D.C. 2020)). It "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands." *Enders v. District of Columbia*, 4 A.3d 457, 471 (D.C. 2010) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975)).

We need not decide whether the government presented sufficient evidence at the suppression hearing to support a finding that Officer Strong saw not just a magazine in Mr. Miller's car but an *illegal* magazine—that is, a magazine with a capacity of more than ten rounds of ammunition.[5] D.C. Code § 7-2506.01(b), (c).

---

theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.'" *Smith v. United States*, 306 A.3d 67, 76-77 (D.C. 2023) (citing *Jones*, 996 A.2d at 840).

[5] While we do not decide the issue, we note the following. The only evidence at the suppression hearing of what Officer Strong saw was supplied through his body-worn camera footage. In that footage, Officer Strong said that he saw a "mag," but he said nothing about the type of magazine or how it appeared to him. The

That is because even if all we have is Officer Strong's exclamation that he saw a "mag," with no basis to conclude that he had probable cause to believe that the magazine was itself unlawful, for the reasons that follow, this was sufficient for the government to meet its burden of establishing probable cause to believe that contraband or evidence of criminal activity was inside Mr. Miller's car.

Entry into or a search of an automobile without a warrant under the automobile exception is permissible "[i]f there is probable cause to believe [the] vehicle contains evidence of criminal activity." *Arizona v. Gant*, 556 U.S. 332, 347 (2009) (citing *Ross*, 456 U.S. at 820-21). *Ross*, moreover, "allows searches for evidence relevant to offenses other than the offense of arrest." *Id.*; *see Harris*, 260 A.3d at 683. Additionally, "probable cause does not demand the certainty we

---

footage does not show the magazine itself and thus sheds no light on what Officer Strong saw. The trial court found that the magazine was facing up, but there was no evidence that Officer Strong saw that at the time. *Cf. United States v. Kiyuyung*, 171 F.3d 78, 84 (2d Cir. 1999) (concluding that the government failed to meet its burden to establish the plain-view exception where the police officer who found a gun during a search did not testify at the suppression hearing and thus there was no evidence "as to how [the gun] came to be within his range of vision"). Nor was there any evidence that, even though he saw the magazine only for a moment, Officer Strong's training and experience enabled him to quickly identify its characteristics.

The government introduced a still photograph of the magazine, and the trial court found that it "corroborated" the location of the magazine. But there was no reasonable basis to conclude that the still photo depicted what Officer Strong saw when he looked through the window with a flashlight—the photo was taken from a different angle, with the car door open, and with the car's overhead light on, and thus it necessarily varied from what Officer Strong saw when he looked through the car window.

associate with formal trials," *Illinois v. Gates*, 462 U.S. 213, 246 (1983); a "practical, nontechnical probability that incriminating evidence is involved is all that is required," *Brown*, 460 U.S. at 742 (citation modified).  *See Prince v. United States*, 825 A.2d 928, 932 (D.C. 2003) ("The test for judging the existence of probable cause is whether a reasonably prudent police officer, considering the total circumstances confronting him and drawing from his experience, would be warranted in the belief that an offense has been or is being committed." (citation modified)).

Here, police officers were dispatched to the scene based on a call about a "traffic crash that ended up getting escalated to a man with a gun," and "a man with a gun is a priority" call.  When Officer Way arrived, he heard someone yelling, "He's got a gun, he's got a gun," and he saw Mr. Miller flee.  There was no evidence that Officer Strong was aware of the reports about a gun, but, under the "firmly established" collective-knowledge doctrine, "although individual officers may not have sufficient knowledge to establish probable cause, the information collectively known, even if not communicated by one officer to the other, can be sufficient." *Parsons v. United States*, 15 A.3d 276, 279 (D.C. 2011) (citation modified); *see In re M.E.B.*, 638 A.2d 1123, 1133 (D.C. 1993) ("[W]hen faced with a fast moving sequence of events involving a number of police officers, a citizen's rights are

protected if, at the time of the intrusion, the information collectively known to the police is constitutionally sufficient to justify that intrusion.").[6]

Officers thus collectively understood that Mr. Miller was fleeing after he forcefully crashed his car into another car and that he was possibly armed. Officers then saw Mr. Miller drop a backpack under a car on his flight route. When officers detained Mr. Miller, he did not have a gun on him. After seeing the magazine in Mr. Miller's car, officers found a gun with an extended magazine under the car where Mr. Miller had jettisoned his backpack. Officers could reasonably conclude that Mr. Miller had fled with a gun (with an unlawful magazine) and then discarded it while running. Officers could further reasonably conclude that Mr. Miller had discarded the gun and magazine because he unlawfully possessed them; because, as Mr. Miller points out, it is not "presumptively unlawful to possess and carry a

---

[6] *But cf. Haywood v. United States*, 584 A.2d 552, 557 (D.C. 1990) ("In cases such as this where probable cause for arrest is predicated in part on the personal observations of the arresting officer, the court may not rely on facts which were available to other officers at the scene unless that information was *communicated to the arresting officer*." (emphasis in original)). In *Ellison v. United States*, we observed that *Haywood* suggests that the collective-knowledge doctrine is "nuanced." 238 A.3d 944, 951 n.4 (D.C. 2020). The facts of *Haywood*, however, were quite unique, involving the arrest of an individual who was on the scene when police officers responded to a lookout for a different individual and an arresting officer who acted without any direction at all. 584 A.2d at 553, 556-57. *See M.E.B.*, 638 A.2d at 1132-33 & n.5 (distinguishing *Haywood*). We do not think that *Haywood* undermines the long line of cases supporting application of the collective-knowledge doctrine in the circumstances present here.

handgun" in the District, Mr. Miller's decision to rid himself of his gun supports a reasonable inference that his possession of the gun *was* unlawful. There was a probability that the magazine inside Mr. Miller's car would have evidentiary value—for example, in the form of fingerprints or DNA—in connection with Mr. Miller's possession of the jettisoned gun and magazine. Ultimately, with reason to believe that Mr. Miller had tossed aside an unlawfully possessed firearm and magazine, that another magazine was inside his car, and that the magazine in the car could have evidentiary value as to Mr. Miller's unlawful possession of the discarded gun and magazine, officers had probable cause to enter Mr. Miller's car under the automobile exception.

Accordingly, we conclude that officers' entry into Mr. Miller's car to seize the magazine after they saw it from outside the car did not violate the Fourth Amendment and therefore the trial court properly denied suppression of the ammunition in the magazine. Because this was Mr. Miller's sole challenge to his UA conviction, we affirm that conviction.

## III. Conclusion

For the foregoing reasons, we affirm Mr. Miller's conviction under D.C. Code § 7-2506.01(a), vacate Mr. Miller's conviction under D.C. Code § 7-2506.01(b), and remand the case for further proceedings.

*So ordered.*